WELCH, Judge.
*673 Jordaan Stanly Creque[1] was charged with and convicted of the intentional murders of Jeffrey Mark Graff and Jessie Jose Aguilar, made capital because the murders occurred during the commission of a robbery (Counts II and III), see § 13A-5-40(a)(2), Ala. Code 1975, and because Graff and Aguilar were murdered by one act or pursuant to one scheme or course of conduct (Count I), see § 13A-5-40(a)(10), Ala. Code 1975. The jury recommended, by a vote of 11-1, that the trial court sentence Creque to death. The Morgan Circuit Court sentenced Creque in accordance with the jury's recommendation. This appeal, which is automatic in a case involving the death penalty, follows. See § 13A-5-53, Ala. Code 1975.
Facts
Creque admitted at trial that he and two friends, Cassandra Eldred and Ezekiel Gholston, made a plan to steal money from the Krystal fast-food restaurant where Creque and Eldred were employed. Creque purchased a 9mm handgun and ammunition on August 23, 2011, the day before the murders. In the early morning hours of August 24, 2011, Eldred drove the two men to the restaurant. Creque had been scheduled to work the overnight shift but had failed to do so. Two employees were working at the restaurant that morning-Graff, the manager, and Aguilar. Creque got Graff's attention by knocking on the drive-thru window, and Graff opened the side door to let him in. Creque and Gholston rushed into the restaurant; Gholston was armed with Creque's 9mm gun. They gathered money from the cash registers, and they took the money from the store's safe, which Creque had forced Graff to open. Graff attempted to diffuse the situation and told Creque and Gholston that they could leave and he would wait 10 minutes before he called the police. Creque and Gholston planned to force Graff and Aguilar into the restaurant's cooler. Graff asked if he could get a jacket for Aguilar, and he was allowed to do so.
Creque gave a statement to the police on the morning of the murders, and he admitted that he had intentionally shot and killed both men. At trial Creque admitted that he shot Graff, but claimed it was unintentional and that he had fired the shot while wrestling over the cooler door with Graff, who was pulling on the cooler door in an attempt to keep it closed. Creque shot Graff one time, in the neck; the bullet pierced his spinal column, and he was paralyzed immediately. Aguilar was shot four times. Creque alleged at trial that after he shot Graff, Gholston took the gun from him and shot Aguilar. Both men died at the scene. Eldred drove them from the scene, and the three divided the money.
Creque went to the apartment he shared with his girlfriend, Brittany Orr. Creque put his share of the stolen money in a stereo speaker, and he told her that someone had been shot at the restaurant. He was not injured when he arrived at the apartment but, while at the apartment, with the intention that it would appear that he had been assaulted and forced to take part in the crimes, he cut himself with a razor on his arms and chest and had Orr hit him on the head and chest with a can of *674 peaches. Orr and Creque went to the emergency room. A nurse contacted the police after Creque told medical personnel that he had been assaulted by men who had shot one or more employees at a fast-food restaurant.
Creque was interviewed at the hospital by police officers as a possible witness to the shootings at the restaurant. He initially told the lead investigator, Sgt. Rick Archer,[2] that he had been riding around with "Taurus," "Quincy," and "Wodie," and that he had been showing them the gun he had purchased earlier that day. He said that they had taken his gun, tortured him, and had forced him to take part in their plan to steal money from the restaurant. However, when the police received additional information from officers investigating the crime, including the fact that Gholston had been at the restaurant, Archer presented that information to Creque and, Archer said, Creque's story "evolved" to account for that information. In Creque's final version of the events, he said that he, Gholston, and Eldred had planned the robbery and that Eldred drove them to and from the restaurant. He described the crime in detail, and admitted that he intentionally shot Graff and Aguilar.
The police recovered cash from Eldred's residence and from the apartment Creque shared with Orr. Gholston led the police to a lake where he had disposed of the gun Creque had purchased, and forensic testing established that the recovered gun was the one from which the fatal shots were fired.
The trial court instructed the jury on the three counts of capital murder charged in the indictment. The court also instructed the jury on felony-murder and robbery as lesser-included offenses. The jury found Creque guilty of the three counts of capital murder as charged in the indictment.
At the penalty phase, Creque presented a variety of evidence offered as support for the imposition of a sentence of life imprisonment without the possibility of parole, including: testimony about his chaotic upbringing that included physical and emotional abuse; evidence about his learning disabilities, educational deficiencies, and the lack of appropriate parental role models; evidence of his chronic abuse of drugs and alcohol; and evidence that he had sustained numerous concussions and other physical injuries during his childhood. The jury recommended that the trial court sentence Creque to the death, and the trial court imposed the death sentence.
Standard of Review
Many of the issues Creque raises on appeal were not raised in the circuit court. Rule 45A, Ala. R. App. P., however, requires this Court to review the circuit court proceedings for plain error. That rule provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In discussing the scope of plain-error review, this Court stated in Floyd v. State, [Ms. CR-13-0623, July 7, 2017] --- So.3d ---- (Ala. Crim. App. 2017) :
" 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly *675 raised in the trial court or on appeal.' Hall v. State, 820 So.2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So.2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So.2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So.2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So.2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So.2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So.2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So.3d 732, 751 (Ala. Crim. App. 2010). '[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." ' United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) )."
I.
Creque argues that the trial court erred when it denied his motion to suppress his statements. Specifically, he argues: that he did not receive warnings pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before he gave his first statement; that a second statement was involuntary because, he says, he did not knowingly, intelligently, and voluntarily waive his Miranda rights after they were read to him; and that a partial audio recording of the second statement was unreliable and should not have been admitted.
In reviewing a circuit court's ruling on a motion to suppress a confession, we apply the standard set out in McLeod v. State, 718 So.2d 727, 729 (Ala. 1998) :
"For a confession, or an inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala. 1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court's determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala. Crim. App. 1984). ...
"The Fifth Amendment to the Constitution of the United States provides in pertinent part: 'No person ... shall be compelled in any criminal case to be a witness against himself. ...' Similarly, § 6 of the Alabama Constitution of 1901 provides that 'in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.' These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) ; Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968)."
*676 An appellate court "may consider the evidence adduced both at the suppression hearing and at the trial." Smith v. State, 797 So.2d 503, 526 (Ala. Crim. App. 2000). "The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the 'totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969) ; Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968)." Id. See also Jones v. State, 987 So.2d 1156, 1164 (Ala. Crim. App. 2006).
Creque filed a pro forma motion to suppress all testimony or other evidence regarding statements he gave to law-enforcement officers. He alleged, among other things, that the statements were not given voluntarily; were coerced or made under duress or as a result of deception; and were taken in violation of his Miranda rights. (C. 511-14.) The trial court held a bifurcated suppression hearing. Before trial, Creque presented the testimony of Dr. Jack Kalin, a forensic-toxicology consultant, who testified about the effects of Ativan, a drug Creque had been given before Archer questioned him at the hospital. Kalin also testified about opinions he had formed from listening to an audio recording of part of Archer's interrogation of Creque at the hospital and from watching a video of Archer reviewing Creque's written statement at the county jail. At trial, Detective Todd Pinion, Archer, and Creque testified about the circumstances surrounding Creque's statements. After considering the testimony, listening to the audio recording of part of the interrogation at the hospital, and viewing the video recording of the interrogation at the police department, the trial court denied Creque's motion to suppress. As to the statements Archer took, the trial court stated:
"I'm finding that the statement was made freely and voluntarily. There's no indication to me that Mr. Creque was under the influence of any kind of drugs legal or otherwise. And, you know, he was very chatty. He was tired and he was sleepy, but that didn't impact his ability to make coherent statements. I just don't think there's any basis for excluding the statement."
(R. 2065-66.)
A. Creque argues that "the initial interrogation" took place at the hospital while he was in custody and that he should have been read his Miranda rights. He says that Pinion, who questioned him initially, knew that he was a suspect and not merely a witness. He further argues that he was "in custody" because a second officer was guarding the door to his hospital room. The record does not support either argument.
Miranda warnings are required only before a custodial interrogation. Miranda, 384 U.S. at 444, 86 S.Ct. 1602. "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. (footnote omitted). The Supreme Court also explained:
"[P]olice officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which Miranda by its terms was made applicable, and to which it is limited."
*677 Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).
As legal principles developed following Miranda, the United States Supreme Court acknowledged, " '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 565 U.S. 499, 508-09, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012).
"In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' Stansbury v. California, 511 U.S. 318, 322-323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). And in order to determine how a suspect would have 'gauge[d]' his 'freedom of movement,' courts must examine 'all of the circumstances surrounding the interrogation.' Stansbury, supra, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted)."
Id.
Two nurses working in the emergency room at Decatur General Hospital, Melanie Boyer and Kathy Groover, testified at trial that they were working at the hospital when Creque arrived there a little before 6:00 a.m. Creque told them that he had been assaulted by the men who had committed the murders at the Krystal restaurant. Boyer and Groover observed that Creque had some bruising and that he had some superficial cuts -all on the left side of his body-with no significant bleeding. Boyer testified that she telephoned the police a few minutes after Creque arrived because it was hospital policy to contact law enforcement to report an assault. Pinion testified that he was at the crime scene when another officer received information from the police dispatcher that a man at the hospital reported that he had seen someone get shot at Krystal. Pinion went to the hospital. When he arrived, the nurses relayed the same information-that Creque had seen something happen at Krystal. Pinion observed that Creque had small cuts on his left arm and chest and that he was breathing heavily and rapidly. He considered Creque a "victim/witness," and he wanted to determine what had happened. (R. 1584.) Pinion testified, "We had a double homicide and he knew some information about it. That's what I was trying to find out." (R. 1585.)
When Pinion testified that he asked Creque what had happened, defense counsel objected on the ground that Creque had not been advised of his Miranda rights before questioning began. The trial court said, "He wasn't in custody, was he?" (R. 1583.) The prosecutor stated that Creque was not in custody at that time, but defense counsel argued that the evidence would show that the investigation was already focused on Creque and that hospital personnel were told that he could not leave. Pinion then testified that he had gone to the hospital because he had been told that a man at the hospital had said he had seen someone get shot at Krystal, and that when he arrived at the hospital the nurses confirmed that Creque had told them that he had seen something happen at the restaurant. Defense counsel then asked the trial court for permission to question Pinion on voir dire, and the trial court allowed him to do so. In response to defense counsel's questions, Pinion testified that Creque was not in custody during the interview and that, if Creque had wanted to leave the hospital, Pinion would have had to allow him to do so. Defense counsel asked Pinion whether he would *678 have stopped Creque if he had tried to leave, and Pinion said he did not know what would have happened. Defense counsel asked Pinion how many additional police officers were at the hospital, and Pinion testified that an officer arrived after he did but, he said, "I did not see him until I got through interviewing Mr. Creque." (R. 1586.) The trial court overruled Creque's objection to Pinion's testimony about his statement, and Pinion testified about what Creque had told him.
Pinion testified that when he asked Creque what had happened, Creque told him that he had seen someone get shot at Krystal. Pinion said he asked Creque how he had seen the shooting, and he testified about the version of events Creque gave him:
"He said that he was walking down the street late at night. A guy by the name of 'T' or Taurus had picked him up, and he had two other black males in the car with him.
"He also stated that he knew one of the other guys by the name of Quincy, but the other guy he didn't know. He gave a general description of him. I asked him a little bit further, you know, and he said that 'T' knew that he worked at Krystals, that Mr. Creque worked at Krystals, and that he wanted to-'T' wanted to go hit a lick, which you know, is basically go rob Krystals that night.
"Mr. Creque then told me basically that, you know, they made me give him information and he said that they beat the information out of him about the ins and outs of Krystals. I asked Creque how he got the cuts, and he said that Quincy was the person who cut him, but he wasn't worried about that at that point in time."
(R. 1587-88.)
Pinion testified that he contacted Archer, his supervisor, and told him what Creque had said. Pinion testified that he knew that Creque "had information to the case that was pretty pertinent," so he instructed another officer to detain Creque if he tried to leave the hospital. (R. 1590.) Pinion said that he told medical personnel that when Archer arrived at the hospital, they would need to move Creque to a private room so Archer could speak with him there.
Pinion's testimony about Creque's statement to him in the hospital was properly admitted. The record does not support Creque's assertion that he was in custody when he was questioned by Pinion.
"The test for custody is whether there was a restraint on freedom of movement of the degree associated with a formal arrest. See Campbell v. State, 718 So.2d 123, 135 (Ala. Crim. App. 1997) ('In determining whether a suspect is in custody, a court must examine the totality of the circumstances of the situation using the perspective of a reasonable person in the suspect's position.'). Stone v. City of Huntsville, 656 So.2d 404, 408 (Ala. Crim. App. 1994) (' "[C]ustody arises only if the restraint on freedom [reaches] the degree associated with [a] formal arrest." ')."
State v. Thomas, 843 So.2d 834, 839-40 (Ala. Crim. App. 2002). See also Nelson v. State, 623 So.2d 432, 434-35 (Ala. Crim. App. 1993) ("Generally, questioning of a patient-suspect in the hospital does not amount to custodial interrogation when the suspect is not under formal arrest. 3 W. Ringel, Searches and Seizures, Arrests and Confessions § 27.-3(a)(3), at 27-16 (2d ed. 1992). '[T]he particular detention or restriction of movement [of a hospital patient-suspect] must rise to the level of a de facto arrest before an individual will be deemed "in custody" for purposes of Miranda.'
*679 People v. Ripic, 182 A.D.2d 226, 587 N.Y.S.2d 776, 779 (1992), appeal dismissed, 81 N.Y.2d 776, 594 N.Y.S.2d 712, 610 N.E.2d 385 (1993). '[C]onfinement to a hospital bed is insufficient alone to constitute custody.' People v. Miller, 829 P.2d 443, 445 (Colo. App. 1991). See also United States v. Martin, 781 F.2d 671 (9th Cir. 1985) (accused, who had been making bombs in his apartment, had been injured in explosion, and had gone to hospital, was not 'in custody' when officers went to hospital and questioned him); State v. Clappes, 117 Wis.2d 277, 344 N.W.2d 141, 145-46 (1984) (accused, who was questioned by police officers in the hospital following an automobile accident, was not 'in custody' because, although he was surrounded by an 'atmosphere of restraint,' the restraint was not 'created by the [law enforcement] authorities')".
Lockett v. State, 489 So.2d 653 (Ala. Crim. App. 1986), presented circumstances virtually identical to those in this case. In Lockett, Officer Harry Renfroe went to a hospital emergency room following the report that a shooting victim, Lockett, was being treated there. When Officer Renfroe arrived, he asked Lockett what had happened, and Lockett reported that he been shot at a house when Raymond Jude came to rob him. Lockett told Renfroe that he had returned fire and had shot Jude. Renfroe then contacted Officer James Parker, who was investigating a homicide in the same area as the alleged robbery, and told Parker that the homicide victim might be Raymond Jude. Lockett was released into police custody that night and was transported to the city jail, where he was advised of and waived his Miranda rights and gave a statement to Parker. Lockett gave another statement to Renfroe, and Parker came into the room during Renfroe's 333questioning. Lockett objected at trial to the admission of all of the statements he made to police officers. As to the statement to Renfroe, we held:
"The appellant's statements to Officer Renfroe in the emergency room were not in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The appellant, at this time, was not the subject of custodial interrogation. He was merely being questioned by Renfroe as a victim of a gunshot wound. Therefore, this statement was properly admitted into evidence."
Lockett v. State, 489 So.2d at 657-58.
As in Lockett, the trial court here correctly determined that Creque was not in custody when he spoke to Pinion, and that Pinion was not required to advise Creque of his Miranda rights before questioning him about what had happened. A reasonable person in Creque's position would not have felt that he was not at liberty to terminate Pinion's questioning and leave. Therefore, we reject Creque's argument that his statement to Pinion was inadmissible.
B. Creque argues that the Miranda waiver he gave to Archer was involuntary because, he says, the "[p]olice capitalized on [his] drug-induced state, deceived him about the purpose of their questioning, and ignored his repeated pleas for medical assistance." (Creque's brief at p. 20.) More specifically, he argues that the post-waiver statement was involuntary because, he says, he was under the influence of Ativan and the drugs and alcohol he had ingested before he went to the hospital and he was coerced. He also argues that he was "drowsy and incapacitated" at the police station when Archer went over his statement with him.
A defendant may waive his Miranda rights "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S.Ct. 1602. A waiver of Miranda rights is considered voluntary when the totality of the circumstances *680 reveals that "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).
Archer testified at the suppression hearing that he went to the hospital to question Creque after he received information from Pinion about Creque's statement. Archer testified that medical personnel told him when he arrived at the hospital that Creque had received an injection of Ativan a short time earlier, and Archer conducted a Miranda colloquy approximately 30 minutes after Creque received the injection. Archer testified that he advised Creque of his Miranda rights from a printed card because he did not have a waiver-of-rights form with him and that Creque indicated that he understood his rights. Archer testified that he had taken statements in several hundred investigations during his many years as an investigator and that he always assessed people during the initial stages of his contact with them to determine whether they could voluntarily waive their Miranda rights. He said that he had encountered people who, he determined, could not voluntarily waive their Miranda rights and he did not try to take a statement from those people at that time. Archer also testified that he was familiar with Ativan and its effects. Archer said that, based on his education and experience, and on his assessment of Creque at the hospital, he determined that Creque was able to knowingly and voluntarily waive his Miranda rights and to give a statement. Creque did not give any indication that he was unaware of what he was saying or doing; rather, Creque discussed details of the crime extensively with him, Archer said. Archer stated that he did not threaten, coerce, or promise anything to Creque to make him give a statement. As part of the Miranda colloquy, Archer told Creque: " 'You understand I'm not threatening or promising you anything to get you to talk to me. I'm anxious to hear what you've got to say, but I'm not promising you anything. With these rights in mind do you wish to talk to me and tell me what you know.' " (R. 2038-39.) Creque said that he did.
Archer said that Creque initially told him the same story he had told the nurses and Pinion-that he had been forced by others to go to the restaurant where the shooting took place and that he had been injured by those people. Creque also told Archer that he had been forced to shoot both victims. When Archer confronted Creque with information gained at the scene or from other witnesses that conflicted with certain details in that story, Creque changed his story. During that time, Archer said, Creque "had the wherewithal to follow along with what I was saying and actually correct me in places." (R. 1976.) By the time Creque finished his statement, someone from the police department had brought preprinted Miranda waiver forms to the hospital, so Archer again advised Creque of his rights. Creque signed the form and again waived his Miranda rights. Archer reduced Creque's statement to a writing. Afterward, Archer went over the statement with Creque, and Creque signed it.
Archer read the statement into the record:
" 'My name is Jordaan Creque. I grew up in Augusta, Georgia. I moved to Hartselle, Alabama about two years ago with my mother. I met Brittany Orr in April of 2010 and we started dating. I moved in with her and her parents in Hartselle. Brittany's cousin, Megan Orr, lived on 7th Street Southeast. About two months ago we moved in with Megan. I turned 21 this past July. I had been wanting a handgun and was finally old *681 enough to get one. Yesterday, Monday, August 23rd, me and Brittany went to Tucker's Pawn Shop in Priceville. I bought a Luger .9 millimeter and a box of bullets. We went back home and stopped in Hartselle on the way. We were on Patillo Street and I saw Ezekiel Gholston out walking. I've known him for about a year. I call him EZ. We picked him up and went back to my house. We stayed there about 30 or 40 minutes. We started talking about hitting a lick. Brittany drove me and EZ to some apartments on Cedar Lake Road to visit EZ's cousin. His cousin wasn't at home. Brittany had dropped us off. So we hung around outside there for about 30 minutes. EZ's girlfriend showed up and gave us a ride to East Acres. She dropped us off by my house. I don't know her name. We went walking. We were smoking weed and talking again about hitting a lick. I had a bag with me and I had the gun in it. I didn't want my girlfriend to get it because she was mad at me. A guy I know rolled up in a gray Lumina [automobile]. I only know him as Taurus. EZ knew Taurus better than I did. He asked if we wanted a ride, and we got in with him. EZ got in the front seat and I got in the back behind him. We started talking about hitting a lick. Taurus brought up the fact that I work at Krystals, and he started asking me questions about it. I could tell that he was thinking about robbing Krystals, and I didn't want to do that. We got in an argument about it, and he hit me in the side of the head. I decided to go ahead and tell him what I knew. I told him about the employees' schedule, the security cameras, and the safe. I told him there could be $8,000 to $10,000 in the safe. They started making a plan and going over the details. They knew I had a gun. The plan was for me to walk up and get them to unlock the door for me because they knew me. .... Once we got in the plan was to get the money out of the safe and the cash registers. We rolled over toward Krystal sometime after 2:00 a.m. Taurus parked on the road behind Krystals and we all got out. I was wearing a cap, a black shirt, and camo shorts. Taurus was wearing black pants, a black shirt, and black cap. EZ was wearing a black shirt, black shorts, a black hat, and a black bandanna over his face. I had gave the gun to Taurus, and he ended up giving it to EZ. I walked up by the drive-through window and I saw the manager, Jeff, in the drive-through window. Jeff saw me and I motioned like I needed to use the phone. Jeff got the phone and walked over and opened the side door for me. When he opened it Taurus and EZ came running up and ran inside, and I went in behind them. I saw Jessie working inside also. EZ grabbed Jessie. EZ told me to take them to the safe. I got the gun from EZ and I told Jeff and Jessie to go to the office. Jeff opened the safe for me. Jeff was trying to joke with me to calm everybody down and talk us out of it. I told Jeff they were serious. I got the money. It was in two bank bags: a clear bag and a green bag. I told Jessie and Jeff to go get in the cooler. Jessie went in the cooler. Jeff asked to get a coat for Jessie and I told him to get it. I forgot before I took them to the safe EZ had Jeff open the registers. After Jeff got a coat he walked back to me at the cooler. I was about to put them in the cooler. Jeff said to me he didn't know how I got wrapped up in all this but he would give us ten minutes to leave before he called the police. I put them both in the cooler and Taurus was yelling at me to finish the job. I opened the cooler door. Jeff was trying to hold the door shut. So when I opened it he came out of the cooler with it. I shot Jeff once or *682 twice and he fell down. I turned the gun on Jessie and fired at him several times. We ran back and got in the car. I threw the gun in the car. Taurus had the money bags. Taurus took off and he was driving crazy. I jumped out of the car on 7th Street and ran home. Brittany opened the door for me. I told Brittany what we had done. She broke down crying. I got in the shower. I had a cut on my left arm from when I fell down as we were leaving. I took a razor and cut my arms and my chest. I decided to go to the hospital and say that I was tortured and forced into doing this. I don't know where Taurus or EZ went. I don't know what they did with my gun or the money."
(R. 1989-95.)
Archer testified that Creque was then placed under arrest and was taken to the police department. He was placed in an interview room that had audio- and video-recording equipment, and Archer reviewed Creque's written statement with him. That statement was videotaped. Archer said that Creque appeared drowsy or tired at that time and that, if he saw Creque's attention wander or saw him close his eyes for an extended period of time, he drew Creque's attention back. After drawing Creque's attention back a few times during the review of the written statement, Archer asked Creque to stand up and move around a bit so he could pay attention as they continued to review the statement. When they completed the review of the statement, Creque again acknowledged to Archer that the statement they had reviewed was the statement he wanted to make. Archer asked Creque additional questions and Creque responded orally and then wrote out answers to those questions on the written statement.
On cross-examination, Archer acknowledged that, during the interview at the hospital, Creque complained of leg cramps at one point and on another occasion he said, "My high is fucking gone," that he felt "weird" from the shot of Ativan, and that his hands were going numb. (R. 2022.) Archer did not ask medical staff to check on Creque after he made those complaints, though he noted that medical personnel were in and out of the room and that Creque did not tell them about his symptoms. On redirect examination, Archer testified that some of Creque's physical complaints appeared to be "manufactured," and were made in conjunction with certain areas of questioning that got "outside of his pre-rehearsed story that he had [come] there prepared to tell." (R. 2039-40.) Archer's testimony was consistent with that of Melanie Boyer, the nurse who performed the initial assessment of Creque in the emergency room. She testified that she believed that Creque was exaggerating his pain level.
Creque testified at the suppression hearing held during the trial. He said that before he received the Ativan injection, Pinion was in his hospital room. He remembered seeing Archer and two other people in the room for brief moments during the rest of the day. Creque testified that after he received the Ativan injection his hands and legs went numb. He said he did not remember giving the statement at the hospital or later signing the written statement. Creque further testified that he did remember being transported to the police department, but he remembered Archer coming into the interrogation room and asking him to sign some papers. He said he did not recall Archer reading the statement to him. Creque said he did not knowingly and intelligently waive his Miranda rights that day. He said he drank alcohol and smoked as much as a half-ounce of marijuana laced with a synthetic marijuana during the day of the shooting, *683 including right before he went to the hospital. At the portion of the suppression hearing held before trial, Dr. Kalin, a forensic toxicology consultant, testified that he had reviewed the audio recording and the video recording of Creque's statements and that he had reviewed some hospital records related to Creque. He testified that "the only thing of note" in the audiotape was that Creque initially appeared agitated or anxious, but that he then spoke freely for the remaining 50 minutes of the interview. (R. 203-04.) With regard to the videotape, Dr. Kalin stated that "the Defendant appeared tired or sleepy or lethargic, which can be an effect ... that's the intended effect of the drug Ativan." (R. 206.) He said that Creque's sleepiness "can also be explained by his lack of sleep." (R. 207.) On cross-examination, Dr. Kalin acknowledged that, because he did not see or examine Creque when the statements were taken, he could not state whether Creque was feigning any of the symptoms or signs he had testified to, including Creque's apparent hyperventilation during the audio-recorded statement. He further acknowledged that the hospital records contained an entry stating a clinical impression that Creque's wounds were self-inflicted. On redirect examination, Dr. Kalin testified that sleepiness he observed in the video could have been caused by the Ativan and that, if Creque was under the influence of any other drugs, that could have impacted his behavior during the audio and video recordings.
We agree with the trial court's finding that Creque's statement was made freely and voluntarily. (R. 2065.) As the trial court observed, even though Creque was tired and sleepy, "that didn't impact his ability to make coherent statements" and, in fact, "he was very chatty." (R. 2065-66.) Nothing in the record indicates that Creque was so impaired by the injection of Ativan and by the drugs and alcohol he said he consumed before he went to the hospital that he was unable to understand and voluntarily waive his Miranda rights and give a statement.
" ' "[U]nless intoxication, in and of itself, so impairs a defendant's mind that he is 'unconscious of the meaning of his words,' the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession." Carr v. State, 545 So.2d 820, 824 (Ala. Crim. App. 1989). "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility in evidence of the confession, but may affect its weight and credibility." Callahan v. State, 557 So.2d 1292, 1300 (Ala. Crim. App.), affirmed, 557 So.2d 1311 (Ala. 1989).'
" White v. State, 587 So.2d 1218, 1227-28 (Ala. Crim. App. 1990), aff'd, 587 So.2d 1236 (Ala. 1991). See also Merrill v. State, 741 So.2d 1099, 1108 (Ala. Crim. App. 1997) ('[U]nless the accused is intoxicated to the extent of mania, intoxication affects the weight and credibility of a statement rather than its admissibility.') Hubbard v. State, 500 So.2d 1204, 1218 (Ala. Crim. App.), aff'd, 500 So.2d 1231 (Ala. 1986) (' "Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible." ' (quoting Tice v. State, 386 So.2d 1180, 1185 (Ala. Crim. App. 1980) ) )."
Floyd v. State, [Ms. CR-13-0623, July 7, 2017] --- So.3d ----, ---- (Ala. Crim. App. 2017). In Nelson v. State, 623 So.2d 432, 435 (Ala. Crim. App. 1993), the defendant, *684 Nelson argued, in relevant part, that a statement given to a law-enforcement officer at a hospital was inadmissible because he was in pain and was under the influence of Demerol when he gave it. This Court disagreed and held that Nelson's statement to the officer at the hospital was admissible, even though Nelson was in pain and receiving medication. We noted that the officer testified that Nelson did not appear to be under the influence of any drugs and that he was alert, coherent, and responsive. We stated, further:
" '[A] defendant's confession [i]s not involuntarily made merely because he was in pain as a result of a gunshot wound at the time he made his confession.' Holladay v. State, 549 So.2d 122, 127 (Ala. Crim. App. 1988) ('although the appellant's wounds were possibly life-threatening, [the police officer testified that] the appellant was conscious, alert, and responsive' when he made his statement), affirmed, 549 So.2d 135 (Ala. 1989) ; Klingel v. State, 518 So.2d 853, 856 (Ala. Crim. App. 1987) (same); Thompson v. State, 462 So.2d 777, 778-79 (Ala. Crim. App. 1984) (fact that defendant's statement was made while he was in pain at hospital did not render confession involuntary).
"Statements made under the influence of sedatives, pain-killers, or other drugs are voluntary unless the drug renders 'the mind of the defendant ... substantially impaired ... [so] as to make [the] individual unconscious of the meaning of his words.' Watkins v. State, 495 So.2d 92, 99 (Ala. Crim. App. 1986). The trial court was warranted in finding that the appellant did not establish that he was under the influence of Demerol to the degree that it rendered his statements involuntary. See Cleckler v. State, 570 So.2d 796, 804 (Ala. Crim. App. 1990) ; Holladay v. State, 549 So.2d 122, 127 (Ala. Crim. App. 1988), affirmed, 549 So.2d 135 (Ala. 1989) ; Cross v. State, 536 So.2d 155, 158-59 (Ala. Crim. App. 1988)."
Id. at 435.
Creque, like the appellants in the above-cited cases, was not so impaired as to make him unconscious of the meaning of his words so as to render his Miranda waiver or his statement involuntary. To the contrary, it is clear from the testimony and from Creque's own statement that he was so alert and so aware of the circumstances and the meaning of his words that he adjusted his version of events to respond to Archer's questions and comments about information from the investigation that conflicted with what Creque had initially told Archer.[3] Furthermore, Creque did not request that Archer stop the review of his written statement because he was tired and incapable of continuing, and he engaged in further discussion with Archer about certain details of statement and wrote additional information on the statement at the conclusion of the review of the written statement.
Finally, we note that Allison Balesteros, a registered nurse, testified that she gave Creque his discharge instructions when he was released from the hospital into police custody. She told Creque to wash his wounds daily and to return to the hospital if needed. Balesteros testified that Creque appeared to understand what she said, and that she had no difficulty communicating with him. The prosecutor asked: "Did he *685 appear to be under the influence of any kind of drugs or anything so he appeared to not be able to pay attention or not communicate with you?" (R. 1873.) Balesteros said that he did not. Finally, she testified that Creque rated his pain level as a 2 out of 10, and that Creque signed the discharge document.
A defendant's allegation that his statement was coerced or was otherwise involuntary because he had consumed drugs and alcohol and was sleep-deprived is a circumstance to be taken into consideration as part of a trial court's review of the totality of circumstances. E.g., Doster v. State, 72 So.3d 50, 78 (Ala. Crim. App. 2010) ; Barber v. State, 952 So.2d 393, 435 (Ala. Crim. App. 2005) ; Grayson v. State, 824 So.2d 804, 832-33 (Ala. Crim. App. 1999) ; and Callahan v. State, 557 So.2d 1292, 1298-99 (Ala. Crim. App.), aff'd, 557 So.2d 1311 (Ala. 1989). Having reviewed the videotape, this Court agrees with the trial court's determination that Creque was obviously tired and sleepy, but not to the degree that it rendered his statement involuntary.[4]
As for Creque's argument that the officers "deceived him about the purpose of their questioning and ignored his repeated pleas for medical assistance," Creque's brief at p. 20, this claim is not supported by the record.
"It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe [v. Connecticut,] 367 U.S. [568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) ], the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, 'if his will has been overborne' by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added)."
McLeod v. State, 718 So.2d 727, 729 (Ala. 1998) (footnote omitted).
Nothing in the record supports even an inference that Creque's will was overborne. During the interrogation, Creque commented about physical sensations that he attributed to the injection of Ativan, but he continued to give his statement and did not ask for medical assistance. He certainly did not make any "pleas for medical assistance," and officers did not mislead him about their purpose for interrogating him. Pinion went to the hospital shortly after Creque arrived there claiming to be a witness to the crime, and he testified that he viewed Creque as a victim and a witness. Archer went to the hospital to question Creque as a witness or a possible suspect, and he told Creque that he was interested in what Creque had to say, but that he was not sure whether Creque was just a witness or whether he had done something wrong. No officer promised Creque anything, forced him to say anything, or threatened him in any way to waive his Miranda rights or to make a statement. There is no support for Creque's claim of coercion.
" '[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court's resolution *686 of [such] conflict[s] should not be reversed on appeal.' Sheely v. State, 629 So.2d 23, 29 (Ala. Crim. App. 1993) (citations omitted). '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion.' Jackson v. State, 589 So.2d 781, 784 (Ala. Crim. App. 1991). 'When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal "unless found to be manifestly contrary to the great weight of the evidence." ' Ex parte Matthews, 601 So.2d 52, 53 (Ala. 1992), quoting Williams v. State, 456 So.2d 852, 855 (Ala. Crim. App. 1984). ' "In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court." ' Kennedy v. State, 640 So.2d 22, 26 (Ala. Crim. App. 1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala. Crim. App. 1985), aff'd, 494 So.2d 772 (Ala. 1986)."
Eggers v. State, 914 So.2d 883, 899 (Ala. Crim. App. 2004). The circuit court based its ruling on testimony from Creque, two police officers, and a forensic-toxicology consultant. The court's decision was also based on its review of the audiotape of the statement and the videotape of Archer's review of the written statement with Creque. Much of Creque's testimony conflicted with the officers' testimony. Because "a trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this Court, ... and is not to be reversed absent a clear abuse of discretion," Jackson v. State, 589 So.2d 781, 784 (Ala. Crim. App. 1991), and because the court's ruling was not manifestly contrary to the great weight of the evidence, we will not disturb the court's ruling. Considering all of Creque's arguments as to the voluntariness of his Miranda waivers and statements in light of the totality of the circumstances, we hold that the trial court did not err in ruling that Creque's statements were voluntary, so they were properly admitted into evidence. Creque is due no relief on this claim of error.
C. Creque argues that the 56-minute audiotape, a partial recording of the longer interrogation at the hospital, was unreliable and inadmissible. Creque did not raise this argument at trial, so the trial court did not have the opportunity to rule on it; we now review the argument for plain error, and we find no plain error. The audiotape was properly admitted at trial.
Archer testified that he used the recording feature on his cell phone to record Creque's statement at the hospital. He said that he had never used the recording feature on his phone before and he was not aware that the cell phone would record for only approximately one hour and then stop recording. Archer testified that he started recording before he advised Creque of his Miranda rights, and that he was unaware that the recording feature had stopped while he was questioning Creque. Archer testified that he arrived at the hospital at approximately 6:30 a.m. and began questioning Creque at 7:00 a.m. He and Creque spoke until approximately 10:30 a.m., and for the two hours after that, Archer reduced the statement to writing. Creque argues that Alabama courts have repeatedly held that partial confessions are inherently unreliable and that confessions should be considered in their entirety. He argues that, during the recorded portion of his statement, he conceded involvement in the crime, but that it was during the unrecorded portion that, according to the State, *687 he admitted that he shot both victims. Creque testified at trial, however, that he accidentally shot Graff and that Gholston shot Aguilar. The admission of the partial recording was highly prejudicial because, he says, it invited the jury to speculate about the contents of the remainder of the recording, "guided by the testimony of the officers." (Creque's brief at p. 25.)
Creque cites King v. State, 355 So.2d 1148 (Ala. Crim. App. 1978), as support for his argument. The State correctly argues, however, that King directly contradicts his argument. King objected on appeal because the trial court admitted a tape recording of his statement even though the recording was not a complete recording of King's interview with the interrogating officer. King argued that the recording did not contain exculpatory statements he made during the interview. We rejected King's claim and stated:
"If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation relative to the subject matter of the issue. Chambers v. State, 26 Ala. 59 (1855) ; William v. State, 39 Ala. 532 (1865) ; Mullis v. State, 258 Ala. 309, 62 So.2d 451 (Ala. 1953). The accused is entitled, on cross examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872).
"However, the rule which frowns upon incomplete confessions is designed to cover cases where an accused, after admitting commission of the criminal act, is prevented from going further and saying anything which might explain or justify his act. No such situation exists in this case for the appellant was permitted to examine the officer as to the remainder of the confession which contained exculpatory statements concerning the shooting.
"We know of no rule which would require a written or recorded confession or statement to contain the entire conversation between the accused and the person to whom the confession was made. A confession should be considered in its entirety. If the state introduced into evidence only a portion of an alleged confession, a defendant is entitled to introduce the remainder of what was said to and by him, including any exculpatory statements which would bear upon the matter in controversy. Furthermore, where an accused has been interrupted or otherwise prevented from completing his confession, that confession is not admissible in evidence.
"These rules were not violated in this case. The appellant was permitted to prove the entire conversation and every exculpatory remark made by her at that time both in the cross examination of the state's witnesses and in her own testimony. For these reasons the admission of the confession was not error."
King, 355 So.2d at 1150-51 (emphasis added, internal citations omitted).
As in King, Creque was permitted to cross-examine Archer about the substance of the entire interrogation and elicit every exculpatory remark he alleges he made. He was able to do the same thing during his own testimony and, in fact, he did so. Creque went so far as to acknowledge on cross-examination that the version of events he testified to on direct examination was his third version. No plain error occurred when the trial court admitted the recording into evidence. See also Ex parte Morrow, 915 So.2d 539, 544-45 (Ala. 2004) ("[T]he fact that a portion of [the defendant's] interview may not have been recorded does not affect the admissibility of the recording. See *688 Avery v. State, 589 So.2d 1313, 1315 (Ala. Crim. App. 1991) ('The fact that parts of the tape recording were inaudible would not affect the admissibility of the recording but the weight which the jury places on the evidence.')").
For all the foregoing reasons, Creque is not entitled to relief as to any of his claims regarding the admissibility of his statements.
II.
Creque argues that R.R., a juror, was biased and initiated contact with the lead investigator, Archer, during the trial, and that she was permitted to serve on the jury in violation of Creque's state and federal constitutional rights. Specifically, he argues that R.R. misled the trial court during voir dire about her relationship with the prosecutor's office and whether she could render a fair and impartial verdict and that she failed to reveal that her nephew had been murdered. Creque argues that R.R.'s bias was revealed when the prosecutor informed the trial court that R.R. had initiated contact with Archer at a department store during a weekend break during the penalty phase of the trial. The trial court and Creque questioned Archer and R.R. under oath before the trial resumed. Creque moved for a mistrial after Archer and R.R. testified, but his motion was based on grounds other than those he now raises on appeal.[5] Therefore, his argument that he is due a reversal based on juror misconduct is reviewed for plain error.
A. Creque argues that R.R. failed to divulge information about her alleged bias in favor of the prosecution, and that if she had properly disclosed that information, he would have exercised a peremptory strike to remove her from the jury. He argues that the trial court's failure to remove her from the jury requires a reversal.
Creque acknowledges that, during voir dire, R.R. stated "that she had minimal familiarity with law enforcement officers and that her nephew had been a shooting victim." (Creque's brief at p. 27.) He argues that R.R. failed to disclose that she had a "close connection" to police officers or to members of the prosecutor's office, and that she had disclosed only that her nephew had been a crime victim but not that he had been murdered. (Creque's brief at pp. 29-31.) This omitted information, he alleges, demonstrates her bias against the defense, and, he says, if R.R. had disclosed that additional information during voir dire, he would have exercised a peremptory strike to remove her. Citing page 2762 of the record, Creque alleges that he sought to have R.R. removed from the jury when the new information was revealed. (Creque's brief at p. 31.) That page of the record contains no request by Creque for the removal of R.R. from the jury, and Creque never made that request.
The Alabama Supreme Court in Ex parte Dobyne, 805 So.2d 763, 771-72 (Ala. 2001), stated:
"The proper standard for determining whether juror misconduct warrants a new trial, as set out by this Court's precedent, is whether the misconduct might have prejudiced, not whether it actually did prejudice, the defendant. See Ex parte Stewart, 659 So.2d 122 (Ala. 1993) ; Campbell v. Williams, 638 So.2d 804 (Ala. 1994) ; Union Mortgage Co. v. Barlow, 595 So.2d 1335 (Ala. 1992). The 'might-have-been-prejudiced'
*689 standard, of course, casts a 'lighter' burden on the defendant than the actual-prejudice standard. See Tomlin v. State, ... 695 So.2d [157,] 170 [ (Ala. Crim. App. 1996) ]. For a more recent detailed discussion of the burden of proof required to make a showing under the 'might-have-been-prejudiced' standard, see Ex parte Apicella, 809 So.2d 865, 871 (Ala. 2001) ('It is clear, then, that the question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case.' (Emphasis [on 'might'] original.) ).
"It is true that the parties in a case are entitled to true and honest answers to their questions on voir dire, so that they may exercise their peremptory strikes wisely. See Fabianke v. Weaver, 527 So.2d 1253 (Ala. 1988). However, not every failure to respond properly to questions propounded during voir dire 'automatically entitles [the defendant] to a new trial or reversal of the cause on appeal.' Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330, 335 (1970)...."
If a defendant establishes that a veniremember's truthful answer during voir dire would have caused him or her to exercise a peremptory challenge to strike the juror, then the defendant has made a prima facie showing of prejudice. Id. at 773. The Alabama Supreme Court in Ex parte Dobyne further stated that some of the factors relevant to the determination of whether a party might have been prejudiced by a veniremember's failure to answer questions on voir dire truthfully include the "temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." Id. at 772 (internal quotation marks and citations omitted).
The record of voir dire does not support Creque's claim of error. During questioning by the prosecutor about whether any veniremember or a close friend or relative had been represented by one of the prosecutor's former law partners, R.R. stated, "Y'all defended my nephew last year in a case, the D.A.'s office." (R. 492.) She said her nephew had been the victim of a crime, and the prosecutor said he would at a later point get into more details about victims of crimes. In response to the prosecutor's later question about whether any veniremember or any of their family members or close friends or relatives had been robbed at gunpoint or otherwise assaulted with a gun, R.R. stated, "My nephew that I mentioned was shot at gunpoint." (R. 524.) The prosecutor then asked R.R. whether the shooting had been during the course of a robbery, and R.R. said it had not been. (R. 524-25.) When the prosecutor questioned veniremembers about their familiarity with various law-enforcement officers, R.R. stated that she worked in the city clerk's office as an account clerk and that she was familiar with some of the officers. R.R. further stated, "I know them all by name and face, but I don't interact with them daily." (R. 542.) R.R. provided the information during voir dire on the topics Creque now claims she failed to give.
Creque argues that R.R. failed to disclose that she had a close relationship with the prosecutor's office and that she had failed to disclose that her nephew had murdered. R.R. testified under oath, outside the hearing of the jury, during trial after she had initiated a conversation with Archer during a weekend break.[6] R.R. testified *690 that her nephew had been in a murder case. The trial court asked R.R. if her nephew had been a defendant, and she said that he had been. She also said: "But I had mentioned that a couple of times." (R. 2764.) In his motion for a new trial, Creque stated that R.R. had testified that she had told Archer that she knew the trial had been difficult for the victims' families because she had been through it. Creque argued:
"It made it sound like she was a family member of a victim of a murder. Then at some point she indicated that her brother [sic] had been shot. As it turns out, her brother [sic] was probably a criminal defendant that was involved being prosecuted by the District Attorney's office. I don't know. I'm not clear in that, and I don't think the record is clear.
"But regardless because of that conversation she had with Detective Archer and the fact that it was not clear and she was not clear during her voir dire as to what if any relationship she had with the District Attorney's office or her family had with the District Attorney's office and if she was indeed a member of a family in which a victim of a crime had been murdered or killed, then of course had we known that we would have certainly struck her. We were not given that information."
(R. 3057-58.)
Creque continues to argue in this Court that, "[h]ad R.R. properly disclosed the information about her connection to the DA's office and the case involving her nephew, defense counsel would have struck her." (Creque's brief at p. 31.)[7] As discussed above, R.R. disclosed during voir dire that her nephew had been a shooting victim and that the prosecutor's office had "defended" him. If Creque had questions about whether R.R.'s nephew had been murdered, he failed to ask R.R. any questions to clarify the matter, and we decline to find that her answers prove that she failed to disclose relevant information during voir dire. Furthermore, R.R. had no other "connection" to the prosecutor's office, and Creque had all of the information that he now says would have formed the basis of his exercise of a peremptory challenge. Therefore, R.R.'s answers in voir dire were not dishonest or misleading, and they did not indicate any bias in favor of the prosecution. Nothing in the record established that the trial court should have sua sponte removed R.R. from the jury on this ground.
B. Creque also argues that R.R.'s alleged bias was revealed when, during a break in the penalty phase of his trial, R.R. initiated contact with the lead investigator, Rick Archer, in violation of the trial court's order to avoid any contact with the parties or the witnesses. Creque argues that the trial court erred when, after the court learned of R.R.'s conversation with Archer, it failed to remove R.R. from the jury or even inquire whether she could be fair and impartial. We review this issue for plain error because, although Creque made a motion for a mistrial after the matter was raised in the trial court, he raised a claim other than the one he now raises. Furthermore, as noted above, although Creque claims that the trial court erred when it failed to remove R.R. from the jury, he made a motion for a mistrial on another ground, and he did not request that R.R. be removed from the jury.
*691 The jury separated for a weekend during the penalty phase of Creque's trial, and, before proceedings resumed in front of the jury on Monday, the prosecutor stated to the court:
"Judge, before we go further, I need to go on the record to let the Court and the defense know that yesterday Lieutenant Archer went to Academy [Sports, a retail store,] during the evening. He was there, and I believe it's juror number 19 [R.R.] apparently works at Academy, came up to him and they had a conversation. There was no facts or evidence discussed.
"We can put Lieutenant Archer on the stand to tell the Court exactly his recollection of the conversation, which was about two or three minutes long, until he realized that it was a juror and he terminated the conversation. But I think they are entitled to know that."
(R. 2758.)
The trial court called Archer to the stand and asked him to testify about what had happened at the store. Archer testified:
"I was at Academy Sports last night just before their closing time. I think it was just before 8:00 p.m. I was in there returning some merchandise and I was shopping, and a female employee walked up to me, and I did not recognize her as a juror. Her face seemed familiar to me. She had on a name tag and it said [R.R.], and she approached me and said, 'Hi, Rick.' And when somebody approaches me like that, I associate it with somebody I know personally and not professionally. So I just did not make that connection.
"And I made some notes and I can probably give a better representation of the conversation because I made notes immediately when I got home as best I could remember. If you would like, I'll refer to these notes and tell you how that conversation went."
(R. 2758.)
The trial court permitted Archer to testify from his notes, and he stated:
"I extended my hand when she called me by name. I extended my hand just to greet her, and she said, 'Can I give you a hug,' and I said, 'Sure,' and gave a casual hug as in hello greeting type of hug. And she said, 'I just wanted you to know that you all did a great job on that case,' which, again, is something that I've heard several times in the last few days. It didn't strike me as anything peculiar. I said, 'thank you very much. It hasn't been easy. It hasn't been easy. It hasn't been easy on anyone involved, particularly the families.' She said, 'Having gone through that before myself, I know how hard it is.' And, again, I was trying to process in my head exactly who she was. I didn't know if this was a victim that I had dealt with in one of my previous cases or what. And I said, 'Well, yeah, each case like this takes a little bit out of you.' And then I said, 'Now we just have to try to get ready and do it all over again.' I said, 'I don't know how the families are going to hold up doing it two more times.' She said, 'I'm glad I won't have to be a part of that.' At that point I realized this was-could probably be-one of the jurors in the case, and that's probably where she knew me and where I should be recognizing her from. And I began at that point immediately to think to cut this conversation off. But the next thing she said was, she said, 'Well, I have some questions just out of curiosity.' She said, 'Actually we all have some questions. I know there are things that you know but we just couldn't hear about, and we really want to know about some of that. Can I ask you those now or do we need to *692 wait until after tomorrow?' And I said, 'Yeah, we don't need to talk about any of that until after everything is over.' I said, 'We always talk to the jurors if they want to talk after a case is over, and I know that we've already talked about doing that in this case, and we do plan to talk to everyone afterwards and answer any questions you all might have.' She asked, 'Well, do you think we'll finish up tomorrow?' And I told her that we might but I didn't know for sure.
"And at that point another customer had walked up approaching her who obviously had a question to ask her, and I used that opportunity to excuse myself and told her goodbye and we parted.
"At no time were the facts of the case or any testimony mentioned or discussed. There was no talk about anything that had been presented during the sentencing phase. There was no mention or any speak of any of the jury deliberations other than to say that she had questions that they wanted asked. And it was obvious to me that she didn't-she didn't appear as though she was trying to be secretive. I think when she first approached me, I think she genuinely believed that she was doing nothing wrong at that point. It didn't appear as though she was coming up to me as hush-hush, kind of can I talk to you. It wasn't that manner at all. She came up to me very openly calling me by name and greeting me in that way."
(R. 2759-62.)
The trial court asked defense counsel if he had any response to the testimony. Counsel said he would like to know what the juror actually said. He also stated:
"And I think that if they are going out asking questions and there's things that were unresolved in their mind, we would ask for a mistrial on the grounds that apparently the jury felt like they didn't get all the evidence. And if that is, in fact, the case, and then how could they have arrived at their decision if they feel like they've not gotten all the evidence. So we would ask for a mistrial."
(R. 2762.) The trial judge said, "Well, we're a long way from that right now," and then questioned R.R. under oath. (R. 2762-63.) The court asked R.R. to state what was said during the encounter with Archer, and she stated, "I can't hardly remember. Nothing specific. At peace, comfortable with my decision, and will be happy when it's over. (R. 2763.) The court continued to question R.R.:
"THE COURT: [Archer] said something about you having gone through this before. Is that something-what were you referring to?
[R.R.]: I've been on jury duty before, and then I also had a nephew that had been in a murder case before.
"THE COURT: Okay. Been in a murder case? Was he a defendant?
"[R.R.]: Defendant.[8]
"THE COURT: Okay.
"[R.R.]: But I had mentioned that a couple of times.
"THE COURT: I understand, I understand. What about questions? He said something about-he said at first he didn't recognize you were a juror and then it became apparent to him that you were. And he said something to the effect that you have had unanswered questions as you thought some of the other *693 jurors did too. But you knew that he probably couldn't answer them and maybe you would have to wait until after this is over to have those answered with-
"[R.R.]: It was nothing relevant of any evidentiary value at all, nothing like that. Just curiosity.
"THE COURT: Okay.
"[R.R.]: Curious questions.
"THE COURT: Does the Defense have any questions for [R.R.]?
"[DEFENSE COUNSEL]: Curiosity about what? What lingering questions do you have?
"[R.R.]: Nothing that was relevant, you know.
"[DEFENSE COUNSEL]: What was it you wanted to ask Detective Archer last night if you remember?
"[R.R.]: Well, and I'm not speaking for anyone else, just me personally. I had a-there was a receipt, photo for Aretha Smith, and I was just wondering whatever happened to Aretha Smith. Which obviously it was not an issue for anyone else. I was just-or it would have been brought up. Somebody would have mentioned her. But, you know, it's just one of those lingering questions that I wonder whatever happened to Aretha Smith or if that was an accident or whatever.
"[DEFENSE COUNSEL]: You said you had some questions for Detective Archer.
"[R.R.]: That was my question. There may be others but-
"[DEFENSE COUNSEL]: Have the other jurors talked to you about lingering questions?
"[R.R.]: Again, it was irrelevant to anything.
"THE COURT: That's your summation of it. We're asking you specifically what it was and let us-
"[R.R.]: That was my question.
"THE COURT: In the discussions with other jurors when y'all were deliberating the case, were there unanswered questions that were raised that you were referring to or-
"[R.R.]: No, no, we would have asked. We would have asked.
"THE COURT: So when you were-you were just whatever happened to what was her name?
"[R.R.]: Exactly. Aretha Smith.
"THE COURT: Aretha Smith. Because she was mentioned at some point during the testimony and never again?
"[R.R.]: Her name was just on the receipt of a photo that they took at the register, that she clocked out at two something that morning. But nobody ever mentioned if she was actually there or if it was an accident when they opened the register or-
"THE COURT: Use-
"[R.R.]: If they just happened to use her number or if she had any knowledge. But she was never mentioned. So we didn't even assume-I personally assumed there was never-maybe she didn't show up. Maybe she didn't work that night, or it was an accident just to open the register."
(R. 2763-67.)
The trial court's final question was, "Have you discussed this with anybody else at any time?" (R. 2768.) R.R. said that she had not done so. The trial court instructed R.R. not to discuss anything with the other jurors. The trial court asked the attorneys whether they had anything else. The prosecutor said he had just felt compelled to let everyone know about the conversation. Defense counsel then stated, *694 "And I had-I don't remember her name, but I rode up on the elevator with one of the jurors this morning, and she said they have coffee in the jury room. So I had [a court officer] run get me a cup. That was the content of our discussion." (R. 2768.) The trial judge then stated: "Well, I walked in with [another juror] this morning, the lady that passed out the other day, and asked her how she was feeling, you know, and was nice to her. I didn't discuss the case with her. I just hope she was feeling well." (R. 2769.) The trial judge then denied the motion for a mistrial, and stated: "I don't think anything occurred that would cause us to have to start over." (R. 2770.)
Creque's only objection at trial was made after Archer testified, and that objection was made "on the grounds that apparently the jury felt like they didn't get all the evidence," and on his concern of how the jurors could have reached their decision if they felt like they had not gotten all the evidence. (R. 2762.) After the court heard testimony from R.R., Creque did not raise any objection or present any additional argument. Rather, the trial court and defense counsel disclosed their own incidental encounters and conversations with jurors during the trial, indicating that Creque did not find Archer's encounter with R.R. to be of any more significance than the ones disclosed by the court and defense counsel. Therefore, his claim in this Court-that R.R. was biased and that the trial court should have removed her from the jury or granted a mistrial on this ground-is subject to review for plain error only.
In Reed v. State, 547 So.2d 596, 597 (Ala. 1989), the Alabama Supreme Court considered whether a juror's misconduct-the juror in Reed conducted an experiment at home during the trial "in order to test the credibility of the police officer's testimony that although it was night he could see the defendant clearly through the tinted windows"-was so prejudicial as to warrant a new trial. The Supreme Court stated that the test for determining whether a juror's misconduct warrants a new trial is whether the misconduct might have unlawfully influenced the verdict rendered. The Court applied the rule to the facts of that case as follows:
"We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror's home experiment. Rather, it is a case's own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been reached. While the question of whether she might have been unlawfully influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant's motion for a new trial that her vote had not been affected by the experiment. We cannot agree with the defendant that the verdict rendered might have been unlawfully influenced, where the results of the home experiment were known only to the one juror who conducted the experiment and that juror remained unaffected by the experiment. The defendant has failed to show that the trial court abused its discretion in denying his motion for a new trial on this basis and, thus, he is not entitled to a reversal."
547 So.2d at 598 (footnotes omitted).
In this case, as in Reed, the effect of the misconduct was confined to R.R., the juror who committed the misconduct. It is undisputed that R.R. told none of the other members of the jury of her conversation with Archer. Likewise, there is no support for Creque's belated claim that R.R.'s contact *695 with Archer unlawfully affected her vote. When R.R. spoke with Archer, the jury had already rendered a verdict in the guilt phase of the trial, and none of R.R.'s comments to Archer involved the substance of the penalty-phase case. There is no basis on which to find plain error in the trial court's denial of the motion for a mistrial and no basis for the trial court to have sua sponte removed R.R. from the jury.
The principles discussed and applied in Reed have been followed repeatedly by this Court. For example, in Woodward v. State, 123 So.3d 989 (Ala. Crim. App. 2011), a juror had a conversation with a television reporter during the trial. The trial court questioned the reporter, who said that she spoke to the juror only about the juror's job. Finding no plain error as a result of the unauthorized conduct between the two, we stated:
"Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion. Gaffney v. State, 342 So.2d 403, 404 (Ala. Crim. App. 1976). An unauthorized contact between the jurors and a witness does not necessarily require the granting of a mistrial. It is within the discretion of the trial court to determine whether an improper contact between a juror and a witness was prejudicial to the accused. Ex parte Weeks, 456 So.2d 404, 407 (Ala. 1984), quoted in Knox v. State, 571 So.2d 389, 391 (Ala. Crim. App. 1990)."
123 So.3d at 1052.
In Apicella v. State, 809 So.2d 865 (Ala. 2001), abrogated on other grounds by the United States Supreme Court in Betterman v. Montana, --- U.S. ----, 136 S.Ct. 1609, 194 L.Ed.2d 723 (2016), before the jury began deliberations, a juror spoke with an attorney with whom he was acquainted. The juror asked the attorney about a legal principle that was relevant to the case, and they spoke about the issue briefly. The juror testified that the conversation did not impact his decision in the case. Apicella argued that the standard to determine whether a juror's conduct caused actual prejudice is whether the extraneous information " 'might have influenced that juror and others with whom he deliberated,' Roan v. State, 225 Ala. 428, 143 So. 454, 460 (Ala. 1932)," and that the juror's conversation with the attorney might have influenced him, so he was entitled to relief. Id. at 870. The Alabama Supreme Court disagreed:
"On its face, this standard would require nothing more than that the defendant establish that juror misconduct occurred. As Apicella argues, the word 'might' encompasses the entire realm of possibility and the court cannot rule out all possible scenarios in which the jury's verdict might have been affected.
"However, as other Alabama cases establish, more is required of the defendant. In Reed v. State, 547 So.2d 596, 598 (Ala. 1989), this Court addressed a similar case of juror misconduct:
" 'We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror's [misconduct]. Rather, it is a case's own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been reached. While the question of whether she might have been unlawfully influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant's motion *696 for a new trial that her vote had not been affected by the [misconduct].'
"It is clear, then, that the question whether the jury's decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case. In this case, as in Reed, the effect of the misconduct was confined to the juror who committed the misconduct. The Reed Court stated:
" 'We cannot agree with the defendant that the verdict rendered might have been unlawfully influenced, where the results of the [misconduct] were known only to the one juror who [committed the misconduct] and that juror remained unaffected by the [misconduct].'
" 547 So.2d at 598. Because no evidence indicates that [the juror] shared the content of his conversation with the other members of the jury and because no evidence indicates that [the juror's] own vote was affected, we cannot say the trial court abused its discretion in finding no actual prejudice."
Id. at 871. See also Gobble v. State, 104 So.3d 920 (Ala. Crim. App. 2010) (no prejudice where juror had conversation with an officer who had questioned the defendant upon her arrest; conversation unrelated to the case); Phillips v. State, [Ms. CR-12-0197, Dec. 18, 2015] --- So.3d ---- (Ala. Crim. App. 2015) (no prejudice resulted from a juror posting a comment to his Facebook social-networking page that he did not know why God put him in that position and that he did not want any part of it, and other individuals responded to his comment).
Nothing in R.R.'s testimony or in Archer's testimony supports Creque's argument that R.R. was biased in favor of the State or that her conversation with Archer had any influence on R.R.'s verdict or the verdict of any other juror. Under the circumstances of this case, we find no plain error in the trial court's failure to sua sponte remove R.R. from the jury or grant a mistrial.
To the extent Creque now argues that the trial court did not conduct a sufficient inquiry into the alleged juror misconduct, we review that claim for plain error because Creque did not first present the argument to the trial court. Creque argues that the trial court failed to inform R.R. that the contact with Archer had been improper; to remind R.R. of the jury instruction that extraneous contact was prohibited; to question any other members of the jury about potential exposure; and to remind R.R. about following the court's instructions generally. For the reasons below, we find no plain error.
This Court has held:
" 'In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark." '
" Holland v. State, 588 So.2d 543, 546 (Ala. Crim. App. 1991). 'There is no per se rule requiring an inquiry in every instance of alleged [juror] misconduct.' United States v. Hernandez, 921 F.2d 1569, 1577 (11th Cir. 1991). '[A] trial judge "has broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves, and not from media publicity or other outside influences." ' United States v. Peterson, 385 F.3d 127, 134 (2nd Cir. 2004), quoting in turn United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994).
*697 " ' "The trial court's decision as to how to proceed in response to allegations of juror misconduct or bias will not be reversed absent an abuse of discretion." United States v. Youts, 229 F.3d 1312, 1320 (10th Cir. 2000). "[I]t is within the trial court's discretion to determine what constitutes an 'adequate inquiry' into juror misconduct." State v. Lamy, 158 N.H. 511, 523, 969 A.2d 451, 462 (2009).'
" Shaw v. State, 207 So.3d 79, 92 (Ala. Crim. App. 2014)."
Luong v. State, 199 So.3d 173, 186 (Ala. Crim. App. 2015).
When the prosecutor informed the court and defense counsel that Archer had reported to them that R.R. had initiated contact with him, the trial court conducted an investigation. The court asked Archer to describe R.R.'s contact with him, and Archer testified from detailed notes he had taken immediately after the encounter. The trial court then questioned R.R. under oath. Defense counsel also questioned R.R. The court asked R.R. whether she had discussed the conversation with anyone else, and she said she had not. The trial court told her not to discuss the matter with the other jurors, and R.R. assured the court she would not do so. The trial court then asked the parties whether they had "anything else" about the matter, and the parties said they did not. (R. 2768.) Defense counsel then described an incidental conversation he had with a juror that day, and the trial court described its own incidental contact with a juror. If Creque had wanted the trial court to conduct additional inquiry or further remind R.R. about the court's instructions, the trial court provided him the opportunity to do so, but he did not avail himself of that opportunity, suggesting that he was satisfied with the trial court's inquiry.
The circuit court exercised its substantial discretion when it conducted what it determined to be an adequate inquiry into the claim of juror misconduct, and we find no abuse of that court's discretion in the matter. We find no plain error, and Creque is not entitled to relief on this claim.
III.
Creque argues next that the trial court erred when it prevented him from presenting to the jury testimony from a forensic expert who, he says, would have given her opinion that the forensic evidence supported his claim that he shot Graff accidentally. He also argues that, in closing argument, the prosecutor capitalized on the trial court's erroneous ruling by making impermissible comments disparaging the witness. Creque says that the trial court's ruling denied him due process because it prevented him from presenting an essential part of his defense.
A. " 'The admission or exclusion of evidence is a matter within the sound discretion of the trial court.' Taylor v. State, 808 So.2d 1148, 1191 (Ala. Crim. App. 2000), aff'd, 808 So.2d 1215 (Ala. 2001). 'The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion.' Ex parte Loggins, 771 So.2d 1093, 1103 (Ala. 2000)."
Windsor v. State, 110 So.3d 876, 880 (Ala. Crim. App. 2012).
"States have substantial latitude under the Constitution to define rules for the exclusion of evidence and to apply those rules to criminal defendants. See United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). This authority, however, has constitutional *698 limits. ' "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " ' Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), in turn quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ). 'This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " 'arbitrary' " or " 'disproportionate to the purposes they are designed to serve.' " ' Holmes, supra, at 324, 126 S.Ct. 1727 (quoting Scheffer, supra, at 308, 118 S.Ct. 1261, in turn citing and quoting Rock v. Arkansas, 483 U.S. 44, 58, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) )."
Clark v. Arizona, 548 U.S. 735, 789-90, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006).
The State's theory of the case-based on all the evidence, including Creque's inculpatory statement to Rick Archer-was that Creque intentionally fired the shots that killed Graff and Aguilar. Creque's theory of the case at trial was that he shot only Graff and that he did so accidentally. To support his theory of the case, Creque presented the testimony of Janice Johnson, a self-employed crime-scene analyst who had experience in crime-scene reconstruction. Johnson examined the physical evidence as well as photographs taken at the scene and reports generated by the State's experts. Johnson testified about numerous actions of law-enforcement officials and crime-scene analysts in Creque's case that, she said, had not been performed properly, and she said other actions to preserve evidence properly should have been taken, but were not. For example, Johnson identified photographs of boxes inside and outside the cooler that had what appeared to be blood on them, and she said that the stains had not been photographed with a scale to show the size of each stain. She said, furthermore, that the stains had not been swabbed and analyzed, so there was no way to determine whether they were bloodstains and, if so, whether the blood was from Aguilar or Graff. Throughout her testimony, Johnson noted repeatedly that bloodstains and blood spatter were photographed without a scale, making it difficult to determine what had happened at the scene.
Creque then presented Johnson's testimony in support of his assertion that he did not intend to shoot Graff:
"Q. [Defense counsel:] Is there any way to tell from that photograph Mr. Graff's position when those blood spatters were made, those bloodstains?
"A. [Johnson:] It implies that his body, where the injury is, is above the floor.
"Q. Above the floor?
"A: Above the floor.
"Q: And it's impossible to tell whether it got there immediately after the shot or later on?
"A: That's correct.
"Q: But it was from above; correct?
"A: Yes."
(R. 2455)(emphasis added).
Johnson's testimony on this point conflicted with that of the State's crime-scene technician, who testified that both victims had been close to the floor when they were shot.
Johnson testified further about the circumstances surrounding Graff's shooting:
"Q [Defense counsel:] Now, on Mr. Graff ... you reviewed the autopsy report, you've reviewed [the report from the *699 State's expert on] firearm and tool marks, and the photographs and evidence in the case, and are you able to form any opinion based on all of that information as to where Mr. Graff was standing when he was shot?
"A: He was standing in the doorway of the cooler outside. Well, in the doorway or just outside.
"Q: Now, if hypothetically the testimony was that Mr. Graff was being shepherded or herded into the cooler by Mr. Creque and Mr. Graff pushed out on the door and Mr. Creque pushed in on the door and the gun went off accidentally, is there anything in your examination of the evidence, the photographs, the reports from the Department of Forensic Science, that says that did not happen that way or could not have happened that way?
"A: No."
(R. 2470-71)(emphasis added).
Creque then asked Johnson: "Is it your opinion that that's a likely scenario that the shooting could have happened that way with regard to Mr. Graff?" (R. 2471.) The State objected, arguing that Creque had failed to lay a proper predicate to establish that Johnson could reach a conclusion, and the trial court offered Creque the opportunity to lay a better predicate. In response to Creque's questions, Johnson again testified that she had read the forensic reports that stated that Graff sustained a near-contact wound and that the bullet traveled downward. Defense counsel then asked: "Now, and if the testimony from Mr. Creque at trial was that he was trying to get Mr. Graff into the cooler and Mr. Graff was pushing out and the gun accidentally went off, does that scenario, that hypothetical fit the evidence that you have viewed in your training and experience?" (R. 2472-73.) The State objected and said that Johnson could not testify about Creque's state of mind at the time of the shooting. The court excused the jury and discussed the matter with the parties. The court stated that Johnson could derive an opinion about Creque's location when he fired the shot but that she could not "offer an opinion about what Mr. Creque was thinking." (R. 2474.) Defense counsel then stated: "That was not the intent of the question. The intent of the question was, is based on what he said the way it happened, not his intent, but the way it happened, does it fit with the forensic evidence. That's the question." (R. 2474.) The court and the parties discussed the matter further, and the trial court stated: "You've gotten in the critical evidence that I think you want to, which allows you then to argue whatever you want to argue based on that evidence." (R. 2475.) The trial court then asked defense counsel what he believed Johnson would say if she were permitted to answer the question. Defense counsel stated: "She's going to say, not talking about his mental state, because we're not in any way offering it for that, but that the way he said physically it occurred, forensically and based on her experience and training and what she's gone over that it could happen that way." (R. 2475-76.) The trial court again stated that Creque had gotten in the key testimony he wanted-that the evidence was not inconsistent with Creque shooting Graff accidentally while they were struggling at the doorway of the cooler.
It is clear that, during the trial, Creque agreed with the trial court's determination that Johnson had presented that relevant testimony because, during closing argument, Creque stated: "You heard from the crime scene expert today. She came in and testified this morning. She told you that Jordaan's testimony was consistent with the physical evidence there at the Krystal scene." (R. 2566)(emphasis added).
*700 On appeal, Creque uses a variety of phrases to express his single argument on this issue-that the trial court prevented his expert from testifying that the evidence was consistent with his defense that his shooting of Graff was accidental. Creque argues: that the trial court prevented him from his attempt to present "the testimony of a forensic expert, Janice Johnson, and to elicit her expert opinion on the forensic evidence, which [the defense] argued was consistent with the defense theory of accidental shooting" (Creque's brief at p. 42); that the trial court denied him "his right to rebut the State's evidence and present a defense by precluding him from introducing expert opinion testimony that went to the heart of the defense case-his contention that the shooting of Mr. Graff was accidental" (Creque's brief at p. 43); that the trial court prevented defense counsel from asking Johnson for her "expert opinion on whether the forensic evidence surrounding the shooting of Mr. Graff supported the defense theory" (Creque's brief at p. 44); that the trial court "prevented the jury from hearing classic trial testimony," that is, "whether, based on her background, training, and examination of the evidence, she formed an opinion regarding the circumstances of the crime" (Creque's brief at p. 45); that trial court's ruling "prevented the defense from presenting an essential part of its guilt-phase case and from effectively countering the State's presentation" (Creque's brief at p. 46)(footnote omitted). He further argues in his brief that, because there was some factual disputes in the evidence, "Ms. Johnson's expert opinion testimony on whether the forensics supported the defense theory of accidental shooting" would have assisted the jury (Creque's brief at p. 49); that the trial court had precluded "testimony from forensic expert Janice Johnson, who planned to explain to the jury that forensic evidence was consistent with the defense theory of accidental shooting" (Creque's reply brief at p. 24); and that he had argued at the hearing on his motion for a new trial that the trial court's ruling prevented the defense " 'from presenting to the jury in a succinct question and answer format one of this key theories of the Defense of the case, that it was an accidental shooting' " (Creque's brief at p. 46 n.29, quoting R. 3501).
No matter the number of iterations offered, the record refutes Creque's single argument. As demonstrated in the testimony set out above, Creque elicited from Johnson the very testimony he now alleges that he was precluded from presenting, that is:
"Q: Now, if hypothetically the testimony was that Mr. Graff was being shepherded or herded into the cooler by Mr. Creque and Mr. Graff pushed out on the door and Mr. Creque pushed in on the door and the gun went off accidentally, is there anything in your examination of the evidence, the photographs, the reports from the Department of Forensic Science, that says that did not happen that way or could not have happened that way?
"A: No."
(R. 2470-71)(emphasis added).
Defense counsel in closing argument clearly stated the same point: "You heard from the crime scene expert today. She came in and testified this morning. She told you that Jordaan's testimony was consistent with the physical evidence there at the Krystal scene." (R. 2566)(emphasis added).
There being no basis for Creque's argument, it must fail.
B. Creque argues that the prosecutor capitalized on the trial court's error by disparaging Johnson, arguing that she was overpaid for her testimony *701 and that she was not credible. Initially, we note that the premise for Creque's argument-that the trial court committed an error on which the prosecutor could capitalize-is faulty. As discussed in the previous section of this opinion, the trial court did not err in its ruling. Nonetheless, we address Creque's argument about the alleged impropriety in the prosecutor's closing statement.
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Crim. App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Crim. App. 1987), aff'd, 534 So.2d 371 (Ala. 1988) (citations omitted) (quoting Barnett v. State, 52 Ala. App. 260, 264, 291 So.2d 353, 357 (1974) ), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala. Crim. App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala. Crim. App. 1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala. Crim. App. 1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala. Crim. App. 1992). See also Largin v. State, 233 So.3d 374 (Ala. Crim. App. 2015), and cases cited therein. "To constitute error a prosecutor's argument must have 'so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)." Benjamin v. State, 156 So.3d 424, 454 (Ala. Crim. App. 2013).
"Prosecutors may also argue legitimate replies to arguments put forward by the defense." Slaton v. State, 680 So.2d 879, 892 (Ala. Crim. App. 1995), aff'd, 680 So.2d 909 (Ala. 1996). "Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead v. State, 585 So.2d 97, 106-07 (Ala. Crim. App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala. Crim. App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993). See also Ferguson v. State, 814 So.2d 925, 945-46 (Ala. Crim. App. 2000), aff'd, 814 So.2d 970 (Ala. 2001).
Creque did not object at trial during the prosecutor's rebuttal argument to what he now asserts was "highly improper language designed to inflame the jury." (Creque's brief at p. 53.) Therefore, we review this issue for plain error only. Creque's failure to object to the alleged improper arguments is weighed as part of our evaluation of his claim of error because the lack of objection suggests he did not consider the arguments to be of significance or harmful when they were made. E.g., Simmons v. State, 797 So.2d 1134, 1165 (Ala. Crim. App. 1999).
*702 Defense counsel stated during his closing argument:
"And I would point out that the State ... didn't challenge her on what she testified to. He challenged her about how much money she was making in this case and whether she had a written report and those sorts of things, but he didn't touch on any of the substance of her testimony. He didn't attack her testimony or the substance of her testimony at all."
(R. 2566-67.)
The prosecutor argued in his rebuttal closing statement:
"You've got all this evidence out here in front of you. Mr. Creque brought in an expert to testify about the forensics and he brought one in to testify about his level of intoxication. We've already talked about the one who said he didn't understand the drugs and the alcohol and the anxiety. He didn't understand that. But the lady that testified today, Mrs. Johnson, she's a hired gun. And she came in and if they would have asked her to say that the moon was made of cheese, she might have done that. I don't know. But I do know one thing about her and it was that she didn't come across to me, or I don't think anybody else in the courtroom, the way that she was supposed to because the forensics was supposed to change everything.
"Do y'all remember [defense counsel] telling you that? 'Folks pay close attention to the forensics because it's going to change everything. It means everything to our case.' What did she change? She received $13,000 to tell us that Mr. Graff was shot above the floor. I hadn't had a day's worth of training in forensics, but I could have told you that. And that's what she's worth. The evidence that we have is his statement, and there's a lot of it, but here's the main piece of evidence to me: his statement of what he did, the gun that he used, not to go to work at Krystal where he got paid for working but for his second job, when he went to get paid for not working, to rob folks. And let me show you what happens when Mr. Creque goes to work. That right there [apparently displaying a photograph of the victims]. That's the result of Jordaan Creque going to work that night with his .9 millimeter pistol to get, as he said, money."
(R. 2586-87.)
The prosecutor's comment on Johnson being paid in the case was a direct reply to defense counsel's comment that the State had focused on how much money she was to be paid in the case, and it was based on Johnson's testimony at trial. The prosecutor's comment also was made in reply to defense counsel's comment that the State had not challenged the substance of Johnson's testimony. The prosecutor permissibly argued that, though defense counsel had promised Johnson's testimony would change everything, her testimony was not truly significant because the prosecutor, himself, could reach the same conclusion based on a review of the crime scene. Comments on the expertise and credibility of a witness are permitted. E.g., Simmons v. State, 797 So.2d at 1168.
Finally, the trial court instructed the jurors repeatedly that the attorney's arguments did not constitute evidence and that they were to decide the case based on all the evidence presented during the trial. (R. 999, R. 1027, R. 2537-40, R. 2589, R. 2625.) We presume a jury follows the court's instructions. E.g., Calhoun v. State, 932 So.2d 923, 965 (Ala. Crim. App. 2005).
Considering the comments to which Creque belatedly objects in the context of the *703 State's entire argument, we do not find that the comments so infected the trial with unfairness as to make Creque's convictions a denial of due process. Therefore, we find no plain error.
IV.
Creque next argues that the circuit court erred when it ruled that the State did not violate Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), during jury selection. After challenges for cause were made, the parties had 48 veniremembers on which to exercise peremptory challenges, so each party had 16 peremptory strikes, and the 4 jurors last struck were to be alternates. The State struck five of six black veniremembers from the panel.
Creque argues that the reasons the State gave the trial court for its peremptory strikes of five black veniremembers were pretextual, that the reasons were not supported by the record, and that the State treated black and white veniremembers disparately. The State argues that the trial court did not err when it denied Creque's Batson motion. We agree with the State.
Before we analyze the facts of this case in light of the relevant legal principles, we first note its unique procedural posture. Creque made a Batson objection only after the jury was sworn and seated, and after the trial court had issued extensive preliminary instructions to the jurors and had dismissed them for the day. Creque asked the trial court: "Do you want to do Batson this afternoon or tomorrow morning?" (R. 1013.) The trial court stated that the jury had been sworn so it was too late for a Batson objection, and it adjourned for the day. The trial court was correct, because Batson objections are timely when they are made before the jury is sworn. E.g., Gavin v. State, 891 So.2d 907, 947 (Ala. Crim. App. 2003).
The next morning, however, before opening arguments were made, the trial court stated:
"Let's revisit Batson from yesterday. Out of an abundance of caution and for the record let me state that I had already considered all the potential Batson challenges, and I had already determined in my own mind that there were no legitimate Batson challenges that I saw.
"I'm going to back up and let y'all articulate for the record any Batson-I thought every strike that the State made and the Defense made for that matter because the Defense actually as I recall according to my notes struck some minorities. There were race-neutral reasons that I saw if I were trying the case that I would have certainly wanted to strike those jurors.
"But out of an abundance of caution, [defense counsel], if you want to state your motion for the record I'll consider it even though it's not timely."
(R. 1017)(emphasis added).
Creque said he "would assert the Batson violations on all of the blacks that were excluded by the State," and said the State "would have to give a race-neutral reason for each one of them," in particular veniremember no. 46, G.P., a black male, and veniremember no. 54, A.B., a black female. (R. 1018.) He said that G.P. gave no indication that he would refuse to impose the death penalty, and that A.B. had answered truthfully and said she would follow her oath. The State put forth its reasons for its peremptory strikes of G.P. and A.B. The judge then told the prosecutor that he was not requiring the prosecutor to put forth his reasons for striking the black veniremembers, and the prosecutor said that he understood. The prosecutor then said that *704 he was going to give his reasons for the strikes nonetheless, and he did so. Not only did the judge indicate that he agreed with the prosecutor's reasons for exercising his strikes, the judge actually articulated additional reasons he found for some of the strikes. For example, when the prosecutor stated that he struck A.B. because her husband had been convicted of drug trafficking, the trial court stated: "I think she also had a nephew that had been convicted," and the prosecutor stated, "Yes, sir. Yes, sir, for a drug charge." (R. 1021.)[9] Creque explained why he believed that the State's strike of juror no. 27, T.M., a black female, was pretextual, and the court said there were several reasons it found the strike to have been race-neutral-including that the juror said she would have difficulty voting for the death penalty. Creque then renewed his Batson motion, and the trial judge overruled it.
On appeal, Creque argues that the prosecutor's reasons for striking the black veniremembers were pretextual and that the State's treatment of black veniremembers and white veniremembers was disparate. This case is unique in that the trial court had independently determined that the State's strikes were race-neutral and that the State would not be required to give its reasons for the strikes, and that when the State then offered its reasons for the record, the trial court put forth additional reasons it found would have supported a race-neutral strike. Even though the trial court did not find that Creque had made a prima facie case of discrimination-and it would not have done so because the court had, itself, examined and agreed with the State's strikes before it allowed Creque to make a Batson objection-and even though it stated repeatedly that it was not requiring the State to put forth its reasons for its peremptory strikes, because the State did give its reasons, those reasons are subject to appellate review. Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.").
A. Creque begins by stating that, in making its determination of whether the State exercised its peremptory strikes in a discriminatory way, the trial court should have considered "the interracial nature of the crime and the racial tension the crime elicited in Morgan County." (Creque's brief at p. 58.) He says the court also should have considered that, on the morning of jury selection, the prosecution had "used the racial slur 'tar baby' in the presence of the trial court." (Id. ) He cites Adkins v. Warden, 710 F.3d 1241 (11th Cir. 2013), in support of his argument. Creque is incorrect. In Batson, the United States Supreme Court stated:
"In deciding whether the defendant has made the requisite showing [of a *705 prima facie case of purposeful discrimination], the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."
476 U.S. at 96-97, 106 S.Ct. 1712 (emphasis added). Clearly, the "relevant circumstances" to be considered relate to the jury-selection process, not to the entirety of the case from its inception. Therefore, the trial court was not required to consider the circumstances Creque now argues were relevant. Of particular note, Creque argues that the prosecutor used what he calls a racial slur-"tar baby"-in the presence of the trial court. Creque's argument far overreaches. The record establishes that the prosecutor used the term in the context of a discussion with the court about whether the parties would question veniremembers individually about their views on the death penalty. The trial court stated that it had earlier said that, because the veniremembers would be questioned individually about any pretrial publicity to which they had been exposed, any veniremembers who had issues with recommending a death sentence would also be questioned individually. The court further stated:
"Otherwise if it's going to be too time consuming we can do it individually on the death penalty. I don't want to do it that way. I don't want something to come out on the death penalty, that issue, that might taint the others. I guess what I'm saying is I'm okay with let's doing it generally but if something comes up let's say-just turn around and say to me can we individually voir dire this person."
(R. 259.)
After the trial court explained its plan for conducting individual voir dire on the death penalty, the prosecutor stated: "You just don't want to get into a tar baby on that issue." The trial court responded: "I don't want to also take three days per panel." (R. 259-60.) Creque states that the term "tar baby" was a racial slur and that the prosecutor's use of the term was one of the "relevant factors" the trial court should have considered as part of its analysis of the Batson claim. (Creque's brief at p. 58.) Clearly, the prosecutor used the term as Merriam-Webster's Collegiate Dictionary defines it, as "something from which it is nearly impossible to extricate oneself." Merriam-Webster's Collegiate Dictionary 1278 (11th ed. 2003). Not only is Creque incorrect in his argument that the trial court failed to consider all relevant circumstances in evaluating the Batson issue, but Creque's assertion that the prosecutor used a racial slur is untenable.
B. Creque argues that each of the prosecutor's strikes against black veniremembers was pretextual and that the State engaged in disparate treatment.
Batson set forth a three-step process by which to evaluate claims of racial discrimination in jury selection. Batson, 476 U.S. at 96-98, 106 S.Ct. 1712. The defendant, who has the burden of proving intentional discrimination, must first make a prima facie showing that the prosecutor struck one or more veniremembers on the basis of race. Second, if the defendant *706 makes that showing, the prosecution must offer a race-neutral basis for striking the veniremember. Third, the trial court must determine whether the defendant proved purposeful discrimination.
Even though the trial court did not find that Creque had made a prima facie case of discrimination, because the State put forth its reasons for exercising peremptory strikes against black veniremembers, we will review those reasons on appeal. "Where the challenged party's explanations for his strikes are a part of the record, those explanations will be reviewed by the appellate courts regardless of the manner in which they came to be in the record. See, e.g., Huntley v. State, 627 So.2d 1013, 1016 (Ala. 1992) ; Jackson v. State, 594 So. 2d 1289, 1293 (Ala. Crim. App. 1991)." Taylor v. State, 666 So.2d 36, 40 (Ala. Crim. App. 1994), aff'd, 666 So. 73 (Ala. 1995). A race-neutral reason is one that is "based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).
" 'When reviewing a trial court's ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court's decision only if the ruling is clearly erroneous.' Yancey v. State, 813 So.2d 1, 3 (Ala. Crim. App. 2001). 'A trial court is in a far better position than a reviewing court to rule on issues of credibility.' Woods v. State, 789 So.2d 896, 915 (Ala. Crim. App. 1999). 'Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, they are better able to determine whether discriminatory patterns exist in the selection of juries.' Parker v. State, 571 So.2d 381, 384 (Ala. Crim. App. 1990)."
Doster v. State, 72 So.3d 50, 73-74 (Ala. Crim. App. 2010). See also Hosch v. State, 155 So.3d 1048, 1068 (Ala. Crim. App. 2013) (quoting Doster ).
In Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), a plurality of the Court concluded that a state court's finding of the absence of discriminatory intent is "a pure issue of fact" that is entitled to significant deference:
"Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding 'largely will turn on evaluation of credibility.' 476 U.S., at 98, n. 21, 106 S.Ct. 1712 .... In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)."
500 U.S. at 365, 111 S.Ct. 1859. The Hernandez Court further stated that it would not overturn a "state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous." Id. at 369, 111 S.Ct. 1859. The plurality stated that a trial court can rightly consider a variety of factors in *707 determining a prosecutor's sincerity in its explanations for its strikes, such as the prosecutor's demeanor, which an appellate court cannot review, and "the fact[ ] that the prosecutor defended his use of peremptory challenges without being asked to do so by the judge ...." Id. at 370, 111 S.Ct. 1859.
"Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken, Caldwell v. Maloney, 159 F.3d 639, 651 (1st Cir. 1998) ; (2) upon a comparative analysis of the jurors struck and those who remained, Turner v. Marshall, 121 F.3d 1248, 1251-52 (9th Cir. 1997), including the attributes of the white and black venire members, [United States v. ] Houston, 456 F.3d [1328,] 1338 [ (11th Cir. 2006) ] ; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned, Miller-El [v. Dretke ], 545 U.S. [231] at 246 [125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ]. Evidence of purposeful discrimination may be shown through side-by-side comparisons confirming that the reasons for striking a black panelist also apply to similar non-black panelists who were permitted to serve. See id. at 241 [125 S.Ct. 2317]. A prosecutor's reasonable explanation for objecting to a black panelist based on his or her opinions or comments may be undercut by the prosecution's failure to object to other white panelists who expressed similar views, and may be evidence of pretext. Id. at 248 [125 S.Ct. 2317]. The prosecutor's failure to strike similarly situated jurors is not pretextual, however, 'where there are relevant differences between the struck jurors and the comparator jurors.' United States v. Novaton, 271 F.3d 968, 1004 (11th Cir. 2001). The prosecutor's explanation 'does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices.' Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (quotation marks and citation omitted). Neither a prosecutor's mistaken belief about a juror nor failure to ask a voir dire question provides 'clear and convincing' evidence of pretext. McNair [v. Campbell ], 416 F.3d [1291] at 1311-12 [ (11th Cir. 2005) ]."
Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir. 2009) (emphasis added). See also Sharp v. State, 151 So.3d 342, 363 (Ala. Crim. App. 2010) (quoting Parker ).
Creque's arguments that the State's reasons for exercising its peremptory strikes against black veniremembers were pretextual and that the State engaged in disparate treatment of black veniremembers and white veniremembers were not presented to the trial court. We held in Hosch v. State, 155 So.3d 1048, 1070 (Ala. Crim. App. 2013) :
" ' "The trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses." ' Harris v. State, 2 So.3d 880, 899 (Ala. Crim. App. 2007) (quoting Heard v. State, 584 So.2d 556, 561 (Ala. Crim. App. 1991) ). The trial court's conclusion on discriminatory intent will be reversed only if that decision is clearly erroneous. E.g., Harris v. State, 2 So.3d 880, 899 (Ala. Crim. App. 2007). 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' Id. (internal quotation marks and citations omitted). Because Hosch did not argue in the trial court that the State's reasons for striking the black veniremembers were *708 pretextual, we have no ruling from the trial court regarding the credibility of the State's reasons. Thus, we must review Hosch's argument on this issue for plain error."
Therefore, as in Hosch, we review Creque's argument on this issue for plain error.
1. Creque argues that the State's reasons for striking veniremember no. 54, A.B., a black female, were not race-neutral. The prosecutor stated that he exercised a peremptory strike because the juror's husband had been convicted of drug trafficking, a dangerous felony. The trial court added that the juror's nephew had been convicted of a drug charge, and the prosecutor agreed, and said the nephew had been sentenced to prison. The prosecutor stated that it had also struck veniremember no. 30, T.B., a white male, because that veniremember's cousin had been convicted of murder, a serious felony, and that he would have struck veniremember no. 33, P.F., a white male, whose cousin had been convicted of murder if the defense had not struck him first. Striking a veniremember on the ground that a member of the veniremember's family has been convicted of a crime is a race-neutral reason for exercising a strike. E.g., Bohannon v. State, 222 So.3d 457 (Ala. Crim. App. 2015) ; McMillan v. State, 139 So.3d 184 (Ala. Crim. App. 2010). Although Creque correctly notes that the prosecutor misspoke because, in fact, A.B. said that her ex-husband had been arrested for-not convicted of-drug trafficking, and that her nephew also had been arrested when drugs were found in his house, the exercise of a peremptory strike against a veniremember where a member of his or her family had been arrested is a race-neutral reason. E.g., Townes v. State, 253 So.3d 447 (Ala. Crim. App. 2015) ; Fearn v. City of Huntsville, 568 So.2d 349 (Ala. Crim. App. 1990). Creque argues that the State had not struck several white veniremembers who had family members with criminal convictions. However, as the State correctly points out, a prosecutor's failure to strike similarly situated jurors is not pretextual where there are relevant differences between the jurors who were struck and those who were not struck, e.g., Sharp v. State, 151 So.3d 342, 363 (Ala. Crim. App. 2010), and that the crime for which A.B.'s former husband had been arrested was a far more serious crime than were the crimes of the family members of the white jurors who were not struck. The family members of the white jurors whom Creque discusses had arrests or convictions for crimes ranging from theft to DUI. Furthermore, the State struck a white veniremember no. 30, a white male, whose cousin had been convicted of murder. Striking similarly situated jurors of both races can rebut an inference of discriminatory intent in the State's strikes against black jurors. E.g., Wilson v. State, 142 So.3d 732 (Ala. Crim. App. 2010).
2. Creque argues that the State's strike of juror no. 46, G.P., a black male, was not race-neutral. The State explained that it struck G.P. because he had been arrested and because he knew a potential witness, Kenny Morrow, who had worked at the Krystal where the murders took place. Morrow is the stepfather of one of the witnesses, Brittany Orr, and the stepgrandfather of the children Creque had with Brittany Orr. Creque argues that the strike was pretextual because, he says, Morrow did not testify at trial and because the State did not strike several white veniremembers who also knew potential witnesses for the State. During individual voir dire, G.P. testified that he had worked with Morrow 20 years earlier, that he had seen him a couple of times since then, and *709 that he still considered Morrow to be a friend. He also said that he had been to Morrow's house and had met some of Morrow's family members, but that had happened "a long time ago." (R. 937.) G.P. stated that he had been arrested when he failed to appear in court to face a charge of driving on a suspended license. Although Creque argues that the State failed to strike white veniremembers who were familiar with State witnesses, the State's strike was race-neutral because G.P. was not similarly situated to the white jurors. G.P.'s long-standing friendship with a potential witness who was related to one of the State's primary witnesses and the children she had with the defendant clearly presented relevant differences between the G.P. and the jurors who were not struck, so the State's reason for striking G.P. was not pretextual. E.g., Sharp v. State, 151 So.3d 342, 363 (Ala. Crim. App. 2010). The prosecutor stated that he also struck G.P. in part because he had been arrested and that he had struck "every juror that was available to us that had been arrested," including a white male and a white female. (R. 1021.) The State's strike of G.P. was race-neutral.
3. Creque argues that the State's strike of veniremember no. 44, M.P., a black female, was not race-neutral. The State explained at trial that it struck M.P. because she gave inconsistent opinions on the death penalty, and that it would have struck any veniremember who "waffled on that issue." (R. 1020.) Creque argues that M.P. did not waffle, but that she misunderstood the initial question about whether she could vote in favor of the death sentence. M.P. was asked twice during group voir dire whether she could do so, and each time she stated, "No." (R. 820.) She then stated that she could vote to recommend a death sentence but that she was "not going to vote for the death." (R. 822.) The trial court then explained to the jurors that it would sentence the defendant and that the jury would recommend a sentence, M.P. then said she could recommend a death sentence. She said during individual voir dire that she had misunderstood the initial questions, but that she could recommend the death sentence. We have reviewed the record of voir dire examination. M.P.'s answers to questions about the imposition of the death penalty were ambiguous; thus, the prosecutor's strike was race-neutral. E.g., Mashburn v. State, 7 So.3d 453 (Ala. Crim. App. 2007).
4. Creque argues that the State's strike of veniremember no. 37, L.J., a black male, was discriminatory. The prosecutor stated that he had exercised a peremptory strike against L.J. because L.J.'s brother had been convicted of rape and had been sentenced to prison, and his cousin had been convicted of shooting into an occupied dwelling and had been sentenced to prison. The prosecutor also stated that L.J. had been arrested and that he had expressed that, at some point in time, he had had "issues" with law-enforcement officers. Creque now argues that the State failed to strike white veniremembers with friends or relatives who had been convicted. However, as noted in Part IV.B.1. of this opinion, the State did, in fact, strike veniremembers whose family members had been convicted of serious crimes, as had two members of L.J.'s family. L.J. stated in voir dire that he had been arrested, and the prosecutor struck white and black veniremembers who had been arrested. The State's strike was race-neutral.
Creque also argues that another of the prosecutor's reasons for striking L.J.-that he a problem with law-enforcement officers-was pretextual because, he says, the record of voir dire established that L.J. did not have a problem with law-enforcement officers and that, instead, L.J.
*710 said some of his friends were local law-enforcement officers. We need not examine the validity of that reason because, "[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made." Johnson v. State, 648 So.2d 629, 632 (Ala. Crim. App. 1994).
5. Creque argues that the State's reason for striking veniremember no. 27, T.M., a black woman, was pretextual. The State said that it had struck T.M. because, at one point during voir dire, she said she could not impose the death penalty. The trial court agreed, and said, "[S]he actually landed so she said she could but she did waffle. I did recall that." (R. 1019.) While explaining its reasons for other peremptory strikes, the State had said that it would have used a peremptory strike "to strike anybody who had waffled on that issue." (R. 1020.) After the State explained its reason for striking T.M., Creque argued that, "I recall the Court making the comment after she was rehabilitated-the Court made the specific comment, 'I wish we had more jurors like her.' Her testimony was that she even though she may have some opposition to the death penalty that she would follow your instructions and follow the law." (R. 1023.) The trial court stated:
"If I were on either side I would, particularly the side asking for that remedy, I would have struck her. That's certainly a race-neutral reason. I would have struck her in a heartbeat. I do admire her honesty and her willingness to put aside her personal beliefs and follow the Court's instructions, but that doesn't mean that her strike was based on the color of her skin."
(R. 1024.)
The trial court was in a far better position than is this Court to determine matters of credibility, and it had great discretion to distinguish whether the State's explanation for each of its strikes was truthful or pretextual. E.g., Hosch v. State, 155 So.3d 1048, 1070 (Ala. Crim. App. 2013). We have no basis on which to conclude that the trial court's decision on discriminatory intent was clearly erroneous, so we will not overturn that decision. E.g., Harris v. State, 2 So.3d 880, 899 (Ala. Crim. App. 2007). The parties questioned T.M. extensively about her beliefs about the death penalty during individual voir dire because she had indicated during group voir dire that she could not vote to impose the death penalty. T.M. said that she was opposed to the death penalty, that she was firm in her conviction that she could never sentence a defendant to death, and that she did not think she could vote for the death penalty regardless of what the evidence showed. Under further questioning, she said that she would follow the trial court's rules and the law and could consider the death penalty but that if the judge was not going to require her to vote a certain way, she then said that she would be more likely to vote to impose a life-without-parole sentence. T.M. "waffled," as the trial court said, and because her answers to questions about the imposition of the death penalty were ambiguous, we agree with that trial court that the prosecutor's strike of T.M. was race-neutral. E.g., Mashburn v. State, 7 So.3d 453 (Ala. Crim. App. 2007).
None of Creque's allegations of error as to jury selection have merit, and he is not entitled to relief as to those claims.
V.
Creque argues that, during his closing argument at the guilt phase of the trial, the prosecutor impermissibly vouched for the credibility of his key witness, Archer, *711 and he exhorted the jury to do its "job" by finding Creque guilty. We disagree on both points.
Creque did not object to the prosecutor's arguments that he now alleges were improper. Therefore, we review this issue for plain error.
" 'While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.' Ex parte Kennedy, 472 So.2d [1106,] at 1111 [Ala. 1985) ] (emphasis in original). 'This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.' Johnson v. Wainwright, 778 F.2d 623, 629 n.6 (11th Cir. 1985)."
Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim. App. 1990), aff'd, 577 So.2d 531 (Ala. 1991).
"Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala. Crim. App. 1978), and that court is given broad discretion in determining what is permissible argument." Bankhead v. State, 585 So.2d 97, 106 (Ala. Crim. App. 1989). This Court will not reverse the judgment of the trial court unless that court has abused its discretion. Id. See also Ferguson v. State, 814 So.2d 925, 945-46 (Ala. Crim. App. 2000) (quoting Bankhead ), aff'd, 814 So.2d 970 (Ala. 2001).
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Crim. App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988) (citation omitted)[abrogated by Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala. 2002) ]. Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Crim. App. 1987), aff'd, 534 So.2d 371 (Ala. 1988) (citations omitted) (quoting Barnett v. State, 52 Ala. App. 260, 264, 291 So.2d 353, 357 (1974) ), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala. Crim. App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala. Crim. App. 1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala. Crim. App. 1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala. Crim. App. 1992). See also Henderson v. State, 248 So.3d 992, 1036 (Ala. Crim. App. 2017), quoting Coral. "[T]his Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Bankhead v. State, 585 So.2d at 106.
Creque first argues that the prosecutor vouched for his key witness, Archer, by stating that he was a seasoned *712 police officer who was very perceptive when interrogating Creque after Creque was arrested. During the initial closing argument, the prosecutor summarized Creque's various explanations of events that, Creque said, led up to the murders. The prosecutor stated that Creque's "early story" had been that he had been carrying his firearm while walking to buy beer at 3:00 a.m. and was picked up by three men, one of whom had a knife and forced him to give up his gun. The prosecutor stated:
"And he abandoned that when a very seasoned police officer, Rick Archer, very, very perceptive in the weaknesses in his story, the bad links in his story. And then he finally, finally said, and you saw the video, the statement you'll have into evidence, he did the shooting. He was asked specifically did anybody else fire a shot? No, just me."
(R. 2551.)
In no way was the prosecutor vouching for the credibility of the witness. Rather, as demonstrated by the quotation above, the prosecutor was commenting on Creque's fluid explanations of events leading up to the murders and noted that Archer's years of experience led him to be able to find inconsistencies and weaknesses in Creque's initial explanation. The prosecutor did not indicate any sort of personal belief about Archer's credibility as a witness, he merely commented on a limited portion of the beginning of the investigation and of the evolution of Creque's stories. The comments were the prosecutor's permissible references to, and impressions from, the evidence.
Creque also argues that the prosecutor vouched for Archer's credibility when, near the end of the rebuttal argument, the prosecutor stated that Archer was one of the best detectives in Alabama. That portion of prosecutor's statement about Archer was made after a lengthy discussion of the many lies Creque had told during the investigation of the case and that the story continued to evolve even in front of the jury. The prosecutor stated, in part:
"His story evolved. I'm not going to spend a lot of time on it because you saw it. You heard the audio tape of how it was Taurus and Wodie, and I think Wodie had the dreadlocks, and Quincy and how they took his gun away from him and they had a big hunting knife and they did all these things to him. When did he give up Ezekiel Gholston? When did he admit that Ezekiel Gholston was involved? It wasn't until Rick Archer said who is EZ. Oh, yeah, I've been lying. That's right. I've been lying. It was Ezekiel. It was me and Taurus and Ezekiel, and that has been his story for two years. Two years that he has lived that lie until yesterday. And now he knows it's changed again. The circumstances have changed. ... But his story continually evolves, and it evolved in front of this jury, and I know that you know that."
(R. 2581-82.)
The prosecutor then stated that Creque
"had problems. There may be two or three detectives in Alabama as good as Rick Archer, but there ain't none better. That was his first problem right there after these murders were committed. And he had to face Rick Archer, and he could not go toe-to-toe with Rick on the facts. So he had to change his story."
(R. 2582)(emphasis added).
Again, the prosecutor was not vouching for the credibility of Archer as a witness. The prosecutor was pointing out the many lies Creque had told during the investigation and, specifically, that Creque changed his story when he was confronted with evidence that conflicted with the story he *713 was telling at that particular time, which happened on several occasions when Archer asked Creque questions based on facts he had learned during the investigation of the crimes. No error occurred as a result of the prosecutor's comment. See, e.g., Johnson v. State, 120 So.3d 1130, 1165 (Ala. Crim. App. 2009) (holding that no error occurred because the prosecutor did not impermissibly vouch for the witness's credibility or make personal assurance of the witness's veracity).
Creque's final claim of error as to the prosecutor's closing argument is that he improperly told the jury to do its "job" by finding Creque guilty. "Generally, an exhortation to the jury to 'do the right thing,' to 'do your job,' or to 'do your duty' is error if it 'impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law.' " Jackson v. State, 791 So.2d 979, 1029 (Ala. Crim. App. 2000). See also Thompson v. State, 153 So.3d 84, 159 (Ala. Crim. App. 2012) (quoting Jackson ). Here, however, near the beginning of his rebuttal closing argument, the prosecutor told the jury that it had received all the evidence available because the State wanted the jury to have everything available to help the jurors reach a verdict. "We've done our job in that respect," the prosecutor said. (R. 2577.) The prosecutor then summarized the evidence presented by both parties and again said that the State had done its job of gathering and presenting evidence. The prosecutor then told the jury that its job, "a tough job," was about to begin. (R. 2588.) The prosecutor asked the jury to do its job and to find Creque guilty based on the evidence the State had presented. The prosecutor did not argue that the jurors should ignore the law, but that the jurors should evaluate all the evidence with which they had been presented. The prosecutor did not state or imply that the jury could do its job only by reaching a guilty verdict.
There was no error and, therefore, no plain error, in any of the prosecutor's comments to which Creque has belatedly objected.
VI.
Creque argues that "Lt. Archer, the State's key witness, bolstered the testimony of multiple previous witnesses, and effectively summarized the State's theory of the case from the witness stand." (Creque's brief at p. 74.) He further argues that the improper testimony invaded the province of the jury. Creque's theory is that, because Archer was in the courtroom for the duration of the guilt phase of the trial and because, as the final witness for the State, the prosecutor occasionally referred to the testimony of certain of the State's witnesses before he asked Archer question, the State put its thumb on the scale of justice by having Archer vouch for the credibility of those witnesses. Creque cites several parts of Archer's testimony to which he now objects, although he raised no objection at trial to those portions of Archer's testimony. Although the failure to object does not preclude review, it does restrict our review to determining whether plain error exists.
It is well settled that determination of witnesses' credibility is a matter for the jury. E.g., Campos v. State, 217 So.3d 1, 12 (Ala. Crim. App. 2015). We have examined the portions of Archer's testimony to which Creque now objects and have found that Archer's testimony did not invade the province of the jury as to its duty and right to make credibility determinations.
Review of Archer's testimony as it relates to several of Creque's specific claims of error reveals only that, when the prosecutor *714 posed questions to Archer about details of his lengthy investigation, he first asked Archer whether he recalled testimony from a witness who had testified earlier in the trial. For example, Creque argues that, when the prosecutor asked Archer whether he had heard Rudy Holmes' testimony, he then "asked Archer to support Holmes' credibility about the events on the night of the crime by referencing phone logs." (Creque's brief at p. 75.) Creque greatly overstates the purpose and substance of Archer's testimony. Archer testified at length about the cellular-telephone-service provider's records showing calls between numbers matching Holmes' account and Cassandra Eldridge's account, and the prosecutor then asked questions about the provider's records matching the number of Holmes' cell phone:
"Q. [The prosecutor] You heard Mr. Rudy Holmes' testimony in here earlier?
"A. [Archer] Yes.
"Q. During this trial?
"A. I did.
"Q. You heard about Mr. Creque using his phone?
"A. That's correct.
"Q. Are these times and dates consistent with his testimony?
"A. This would be consistent with the time when [codefendant] Gholston should have been in possession of Rudy's phone."
(R. 2097.)
The prosecutor was not attempting to "support Holmes' credibility" or otherwise personally vouch for Holmes' truthfulness. Judgment of Holmes' credibility-along with Archer's credibility and the credibility of every other witness-was properly left within the jury's province, and Archer's testimony cannot be considered an improper bolstering or vouching for any other witness's testimony. Furthermore, Creque cites no Alabama authority for the proposition that testimony such as Archer's constitutes improper bolstering or vouching for a witness's credibility, and our research has disclosed none.
In another of Creque's allegations of error as to this issue, he argues:
"[T]he State asked Archer to tell the jury about 'testimony we've heard' from Holmes and State witnesses Melanie Moose and Jessica Stover regarding Mr. Creque's actions on the night of the crime, (R. 2139), and to remind the jury that two Krystal employees had left early on the evening of the crime, an important point for the State who repeatedly sought to inflame the jury by implying that there could have been additional victims."
(Creque's brief at p. 75)(footnote omitted).
Creque's summary of that portion of the record is inaccurate:
"Q. [Prosecutor:] Who were y'all able to determine was supposed to be working at the Krystal on the night of August the 23rd leading into the 24th, 2011?
"A. [Archer:] Well, scheduled to work first of all would have been the Defendant, who failed to show up, but that would have left four others: the two decedents and then Melanie Moose and the other female. I forgot her name. She testified.
"Q. Jessica Stover?
"A. Yes. The one that testified earlier that she had gone home early.
"Q. All right.
"A. So that would have left four that should have been there."
(R. 2138-39.)
Simply put, Creque's summary of the record bears no resemblance to the testimony *715 in the record. Archer referred to Stover having testified solely because he could not remember her name.
No plain error occurred, and Creque is not entitled to relief on this claim.
VII.
Creque next argues that the trial court erred when it failed to instruct the jury on any lesser-included offenses for the offense charged in Count I, the murder of two or more persons pursuant to one act, and when it instructed the jury to deliberate first on Count I, "thereby erroneously limiting the jury's options during deliberations and creating an impermissible risk that they would convict Mr. Creque of the maximum charges in violation of Beck v. Alabama, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)." (Creque's brief at p. 79.)[10] Creque did not raise these objections in the trial court, so we review for plain error.
During the charge conference, the trial court first considered what instructions should be given as to Count I, the murder of two or more persons pursuant to one scheme or course of conduct. The court said that there were no lesser-included charges as to Count I, but Creque requested that the court charge the jury on felony-murder, based on Creque's testimony that he did not intend to kill either victim. As the trial court and the parties discussed the jury charges further, Creque argued that the lesser-included-offense instruction should be on intentional murder rather than felony-murder. The trial court continued to analyze the relevant testimony and legal principles, and concluded that no jury charges should be given as to any lesser-included offenses on Count I. The trial court stated to defense counsel: "So your only defense assuming that the jury believes everything Mr. Creque said on the stand yesterday is not guilty," and defense counsel responded: "[to] that charge." (R. 2522.) The trial court stated, "To that charge. I can't find and I can't think of a lesser-included if his testimony is true." (R. 2522.) The trial court said:
"I'm going to give them the pattern charge on the intentional murder of two or more people in one transaction, and if they believe that he is telling the truth and Mr. Graff's murder or death was unintentional, then they have to find him not guilty because the State hasn't proved an essential element in that it was intentional."
(R. 2522-23.) Defense counsel replied: "If you'll tell them that, that's fine." (R. 2523.)
The trial court later instructed the jury that, as to Count I, it had two options-it could find Creque either guilty or not guilty. Creque did not object to the court's charge on Count I.[11]
We have repeatedly held that a trial court has broad discretion when formulating its jury instructions so long as the instructions accurately reflect the evidence *716 and the law in the case. See, e.g., Harbin v. State, 14 So.3d 898, 902 (Ala. Crim. App. 2008). When reviewing a trial court's instructions, the jury charge must be considered as a whole and given a reasonable construction. Pressley v. State, 770 So.2d 115, 139 (Ala. Crim. App. 1999), aff'd, 770 So.2d 143 (Ala. 2000). We have also stated that a
"trial court may refuse to give a requested jury charge when the charge is either fairly and substantially covered by the trial court's oral charge or is confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law. See Hemphill v. State, 669 So.2d 1020, 1021 (Ala. Crim. App. 1995) ; see also Ex parte Wilhite, 485 So.2d 787 (Ala. 1986)."
Jones v. State, 217 So.3d 947, 960 (Ala. Crim. App. 2016).
"A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge." Pilley v. State, 930 So.2d 550, 562 (Ala. Crim. App. 2005). Creque argues that there was a rational basis for an instruction on reckless manslaughter because the jury could have "partially credited" his testimony and concluded that he was responsible for shooting Graff but did not fire the shots that killed Aguilar. He also argues that the jury could have found that he could not have formed the specific intent to kill either person because he was severely intoxicated and that, therefore, he was guilty of one or two counts of reckless manslaughter.
Creque is not entitled to a holding that the trial court committed plain error when it failed to sua sponte charge the jury on reckless manslaughter as to Count I.
In Williams v. State, 795 So.2d 753, 779 (Ala. Crim. App. 1999), we stated: "[W]e have held that it is not plain error for a trial court not to give an instruction on a lesser included offense when that instruction would be inconsistent with the defense's trial strategy. See Bush v. State, 695 So.2d 70, 113 (Ala. Crim. App. 1995), aff'd, 695 So.2d 138 (Ala. 1997)." See also McWhorter v. State, 781 So.2d 257, 266-69 (Ala. Crim. App. 1999) (discussing cases holding that no error occurred when a trial court failed to instruct the jury on lesser-included offenses where the instructions would have been inconsistent with the defense trial strategy). In Bush v. State, this Court also cited United States v. Chandler, 996 F.2d 1073, 1099 (11th Cir. 1993), and Kubat v. Thieret, 867 F.2d 351, 365-66 (7th Cir. 1989), for the proposition that the court has no duty to sua sponte offer instruction on a lesser-included offense when counsel might have made a strategic decision not to request such an instruction.
During his closing argument to the jury, defense counsel stated that Creque had testified that he did not shoot Aguilar and that he shot Graff only by accident. Counsel argued that, because Creque testified that he accidentally shot Graff, he could not be found guilty of the intentional murder of two or more people during a single course of action and that the jury therefore should find him not guilty as to Count I. As to Count II and Count III, counsel argued that, because Creque testified that he did not mean for anyone to be harmed, he was not guilty of capital murder but was guilty of felony-murder. Clearly, defense counsel made the strategic decision to argue that, as to Count I, the jury should find Creque not guilty because the accidental shooting of Graff precluded a guilty verdict on that count. An instruction on reckless manslaughter as a lesser-included offense would have been inconsistent and incompatible with the defense strategy, and it would have been confusing and misleading to the jury. Therefore, we *717 hold that the trial court did not commit plain error when it failed to sua sponte charge the jury on reckless manslaughter as to Count I of the indictment.
Creque also argues that the trial court erred when it instructed "the jury to proceed sequentially through the verdict forms, (R. 2619-20), starting with Count I and proceeding to the subsequent charges only after resolving the verdict on Count I, where the judge told them, 'it's either guilty or not guilty.' (R. 2610.)." (Creque's brief at p. 82.) He argues that the trial court's instruction "created an impermissible risk" that the jury would convict him of capital murder on Count I rather than acquit him of the charge. He further argues that "the conviction on Count I effectively precluded the jury's consideration of felony-murder on the subsequent counts." (Id. ) Creque's legal theory is ill-founded, but, more importantly, the record does not support his underlying assertion. Neither the record pages cited by Creque nor any other page of the record show that the trial court instructed the jury to proceed sequentially through the verdict forms.
Creque is not entitled to relief on this claim.
VIII.
Creque argues that the trial court erred at the penalty phase when it excluded certain evidence he offered as mitigation, and when it failed to give much weight to the mitigation evidence he did present.
A. The United States Supreme Court has held "that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (footnotes omitted). Alabama law allows a defendant to offer evidence of statutory mitigating circumstances and any other relevant mitigating circumstances. See § 13A-5-51 and § 13A-5-52, Ala. Code 1975. Section 13A-5-45(c), Ala. Code 1975, states, in relevant part: "At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51, and 13A-5-52." Determination of the relevance of the proposed mitigation lies in the trial court's sound discretion. E.g., Ex parte Smith, 213 So.3d 214 (Ala. 2003) ; Knotts v. State, 686 So.2d 431, 444 (Ala. Crim. App. 1995), aff'd, 686 So.2d 486 (Ala. 1996). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala. R. Evid. The trial court did not err when it excluded the evidence Creque sought to have admitted.
Creque offered several exhibits during direct examination of Cheri Hodson, his mitigation expert. He sought admission of defense exhibit no. 65, a "social history report" that defense counsel acknowledged was a summary of Hodson's testimony along with some quotations from learned treatises. The State objected to the admission, in part because the report was cumulative to testimony Hodson had given based on the report. The State objected also on the ground that Hodson had inserted into the report information from various reference materials that, the State appeared to argue, were irrelevant. The *718 trial court excluded the report[12] based on Rule 803(18), Ala. R. Evid., which provides exceptions to the preclusion of hearsay. Rule 803(18) provides that "the following are not excluded by the hearsay rule":
"To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."
Although we do not necessarily agree with the trial court's exclusion of the report simply on the basis that it was hearsay, we find no error in the trial court's exclusion of the report. Even hearsay evidence may be admitted at a sentencing hearing, if the evidence is relevant and probative. The report was neither. As the State and both parties agreed, Hodson had already testified to the substantive details of the report she had gathered during her investigation. Her written summary of those details would not have added anything to that testimony. Furthermore, the report contains what appear to be quotations from three sources, but does not include a complete citation to any of the purported sources and, for one of the quotations, no source is attributed. Those portions of the report had no probative value and would have been properly excluded on that basis. Therefore, we find no error with the trial court's exclusion of defense exhibit no. 65.
Creque also objects to the trial court's exclusion of defense exhibit no. 73. Hodson described the exhibit as a social-history timeline that was a summary of her notes of the investigation. Defense counsel asked: "[B]ecause I get so disorganized and jump around a lot, you made that up to kind of organize things for us today, is that correct?" (R. 2775.) Hodson agreed. As with defense exhibit no. 65, this exhibit was not relevant or probative because, as the prosecutor stated in his objection, the timeline was a written version of her testimony and amounted only to "a chance for her to write out what she wanted to say while she was testifying." (R. 2775.) The exhibit did not have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would [have been] without the evidence." Rule 401, Ala. R. Evid. Therefore, the trial court did not err in excluding the exhibit.
Creque argues that the trial court erred when it excluded defense exhibit no. 75, which Hodson described as "a list of the Department of Justice risks and protected factors regarding certain exposures that cause children to be at greater ... risk for violent behavior." (R. 2778.) She said she used information she had discovered during her investigation to mark items on the two-page checklist. Creque offered it "as a demonstrative aid" to help the jury determine the proper sentence. (R. 2779.) Hodson testified that the worksheet came from "a publication by the Department of Justice," but was unable to identify the publication. (R. 2780.) She testified that, "in a capital death penalty case, the Department of Justice makes a determination as to whether or not the death penalty can be sought. And a showing in *719 Washington needs to be made by the defense of the mitigating factors and a little bit about their case." (R. 2781.) She further stated that the checklist was used for capital-murder cases in the federal system. (R. 2782.) Because the checklist was for use in the federal system, not in Alabama's judicial system, it was irrelevant, had no probative value, and was properly excluded. In any case, the State said that Hodson could testify to the information contained on the checklist based on her investigation and noted that Hodson had already testified to some of the items on the checklist. The trial court said it was not inclined to let the checklist, itself, into evidence but that it was "not at all reluctant to let her testify and testify freely" about the information on the checklist. (R. 2784.) Not only did Hodson testify from the checklist about items she had determined were of significance to the case but, at the conclusion of questioning about this exhibit, defense counsel asked whether, in her training and experience, all of those risk factors she identified from Creque's youth indicated that he might become a violent offender, Hodson quoted from the last page of defense exhibit no. 75: "Well, I would say it's not just my training and experience. To me what's most important is the quote on the last page: 'The larger the number of risk factors to youth, to which the youth was exposed, the greater the probability of violent behavior in the community.' " (R. 2790.) Creque was able to place before the jury all of testimony he deemed relevant from the exhibit, and the trial court's exclusion of the two-page checklist was not error.
B. Creque contends that trial court failed to give weight to nearly all the mitigating circumstances he presented at trial. He lists from the trial court's sentencing order the many times the trial court stated that it gave little or no weight to a mitigating circumstance it found to exist. He then cites cases standing for the proposition that a sentencer may not refuse to consider evidence proffered as mitigation, and asserts that the trial court violated that rule of law. Creque did not raise this issue in the trial court, so we review it only to determine whether plain error exists.
"The United States Supreme Court's decision in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), requires that a circuit court consider all evidence offered in mitigation when determining a capital defendant's sentence. However,
" '[m]erely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that [circumstance]. Mikenas [v. State, 407 So.2d 892, 893 (Fla. 1981) ] ; Smith [v. State, 407 So.2d 894 (Fla. 1981) ]." Harrell v. State, 470 So.2d 1303, 1308 (Ala. Crim. App. 1984), aff'd, 470 So.2d 1309 (Ala. 1985)."
" Perkins v. State, 808 So.2d 1041 (Ala. Crim. App. 1999). ' "Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance." ' Simmons v. State, 797 So.2d 1134, 1182 (Ala. Crim. App. 1999), quoting Wilson v. State, 777 So.2d 856, 893 (Ala. Crim. App. 1999). ' "While Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority." ' Ex parte Slaton, 680 So.2d 909, 924 (Ala. 1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala. Crim. App. 1989)."
*720 Albarran v. State, 96 So.3d 131, 212-13 (Ala. Crim. App. 2011).
The trial court's analysis of the evidence Creque offered as mitigating comprised 10 pages of the 20-page sentencing order. The court's discussion of the evidence and its findings is detailed and thorough. The trial court satisfied its duty to consider all the evidence Creque offered as mitigating, and the court was free to exercise its discretion in determining whether the evidence was mitigating and also to determine the weight, if any, that evidence was due. There being no factual basis underlying Creque's claim of error, we find no plain error.
IX.
Creque argues that the trial court erred when it denied his motion for a change of venue. Specifically, he argues that the online version of the local daily newspaper contained many inflammatory and racially charged comments made by people who read online articles about the crime. Creque argues, too, that he had demonstrated at the hearing on the motion-through the testimony of his expert, Dr. Verne Kennedy-that a majority of Morgan County residents followed news coverage of the crime and that more than one-fourth of the residents believed he was guilty.
The United States Supreme Court has held that if a defendant cannot obtain an impartial jury in the jurisdiction where he or she is to stand trial, the trial court should transfer the case to another jurisdiction where the jurors are not biased. Rideau v. Louisiana, 373 U.S. 723663 (1963). Alabama law guarantees this right in § 15-2-20, Ala. Code 1975, and in Rule 10.1, Ala. R. Crim. P.
In Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the United States Supreme Court stated:
"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."
A trial court has substantial discretion in ruling on a motion for a change of venue because it can best determine whether the defendant will be unable to receive a fair trial because of community bias and pretrial publicity. Hosch v. State, 155 So.3d 1048 (Ala. Crim. App. 2013) ; Scott v. State, 163 So.3d 389 (Ala. Crim. App. 2012). The trial court is better able than an appellate court to determine whether the alleged prejudicial pretrial publicity had any effect on the individual veniremembers and on the community as a whole. E.g., Joiner v. State, 651 So.2d 1155, 1156 (Ala. Crim. App. 1994). A trial court's ruling on a motion for a change of venue will be reversed only for an abuse of discretion. E.g., Woodward v. State, 123 So.3d 989 (Ala. Crim. App. 2011).
A defendant seeking a change of venue has the burden of establishing either actual prejudice or presumptive prejudice. Creque argues that he established *721 both presumptive and actual prejudice.
"Prejudice is presumed ' "when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." ' Hunt [v. State ], 642 So.2d [999,] 1043 [ (Ala. Crim. App. 1193), aff'd, 642 So.2d 1060 (Ala. 1994) ](emphasis omitted)(quoting Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir. 1985) ). ' "To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice." ' Jones v. State, 43 So.3d 1258, 1267 (Ala. Crim. App. 2007) (quoting United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir. 1990) ). 'In order to show community saturation, the appellant must show more than the fact "that a case generates even widespread publicity." ' Oryang v. State, 642 So.2d 979, 983 (Ala. Crim. App. 1993) (quoting Thompson v. State, 581 So.2d 1216, 1233 (Ala. Crim. App. 1991) ). Only when 'the pretrial publicity has so "pervasively saturated" the community as to make the "court proceedings nothing more than a 'hollow formality' " ' will presumed prejudice be found to exist. Oryang, 642 So.2d at 983 (quoting Hart v. State, 612 So.2d 520, 526-27 (Ala. Crim. App.), aff'd, 612 So.2d 536 (Ala. 1992), quoting in turn, Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ). 'This require[s] a showing that a feeling of deep and bitter prejudice exists in [the county] as a result of the publicity.' Ex parte Fowler, 574 So.2d 745, 747 (Ala. 1990)."
Floyd v. State, [Ms. CR-13-0623, July 7, 2017] --- So.3d ----, ---- (Ala. Crim. App. 2017).
This Court has concisely stated, " 'Publicity' and 'prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial." Hunt v. State, 642 So.2d 999, 1043 (Ala. Crim. App. 1993), aff'd, 642 So.2d 1060 (Ala. 1994).
"In determining whether presumed prejudice exists, we look at the totality of the circumstances, including the size and characteristics of the community where the offense occurred; the content of the media coverage; the timing of the media coverage in relation to the trial; the extent of the media coverage; and the media interference with the trial or its influence on the verdict. See, e.g., Skilling v. United States, 561 U.S. 358, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), and Luong v. State, 199 So.3d 139, 146 (Ala. 2014). '[T]he "presumptive prejudice" standard is " 'rarely' applicable, and is reserved for only 'extreme situations.' " ' Whitehead v. State, 777 So.2d 781, 801 (Ala. Crim. App. 1999), aff'd, 777 So.2d 854 (Ala. 2000) (quoting Hunt, 642 So.2d at 1043, quoting in turn, Coleman, 778 F.2d at 1537 ) )."
Floyd v. State, --- So.3d at ----.
To prove actual prejudice a defendant must present more than information about the publicity that surrounded his case before trial.
" 'Actual prejudice exists when one or more jurors indicated before trial that they believed the defendant was guilty, and they could not set aside their opinions and decide the case based on the evidence presented at trial.' Hosch v. State, 155 So.3d 1048, 1118 (Ala. Crim. App. 2013). 'The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved.' Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985). ' "It is sufficient if the *722 juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. ..." ' Id. (quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) )."
Floyd v. State, --- So.3d at ----.
In his pretrial motion for a change of venue, Creque alleged that the murders received such extensive publicity in a manner so prejudicial to him that he could not receive a fair trial in Morgan County. Specifically, he alleged that print and broadcast media reported on the crime in detail, and that they portrayed him in such a way as to provoke the community's hostility toward him. Creque also alleged that a report submitted by Dr. Verne Kennedy, who had conducted a survey regarding the need for a change of venue, stated that media exposure and the report of a confession by a defendant increase the likelihood that prospective jurors would hold an opinion that the defendant was guilty. Creque submitted as exhibits numerous media reports of the crime and the proceedings before the court, and he included in some of those exhibits comments posted on the Internet by readers in response to the articles.
The trial court held a hearing on the motion. Creque argued at that time that the media reported repeatedly that he had confessed to shooting his two coworkers and that, as a result of those reports, he could not get a fair trial. The prosecutor argued that a majority of the news reports had been published or broadcast more than two years earlier, and that, in any case, the standard Creque had to meet was not that there had been a great deal of publicity or even that many people believed he was guilty. Rather, the prosecutor argued, the ultimate test was whether the prospective jurors had such a fixed opinion of Creque's guilt that they could not set the opinion aside and follow the trial court's instructions.
Creque presented the testimony of Dr. Verne Kennedy, who had conducted an opinion survey of 300 randomly selected people who were eligible to serve on a jury in Morgan County. He testified that his task was not to state an opinion about whether a fair trial could be held, only to point out potential difficulties of ensuring that a fair trial was held. He stated that 58 percent of the sample had an awareness of the murders, and nearly 50 percent of the sample said they were familiar with some of the reported details of the murders. Kennedy testified that, of the members of the sample who said they had seen or read a great deal about the case through media reports about the crime or from speaking to others about the crime, more than 50 percent stated that they believed Creque was guilty. However, he acknowledged that he could not state that a person who held that belief based on information gained before trial would, in fact, vote to convict the defendant at trial. The majority of those sampled stated either that they did not have an opinion of Creque's guilt or that a determination of guilt would depend on the evidence presented at trial.
Kennedy testified that a majority of the sample who remembered reports from the news media or from conversations with others that Creque had confessed to the crime believed he was guilty. He said that, based on his experience and training, it was difficult or impossible for a juror to put out of his or her mind that a defendant had confessed to a crime before trial if the confession was not admitted into evidence. The trial court asked Kennedy whether his opinions would be different if the confession were admitted into evidence, and Kennedy testified that, if the confession were admitted, he would have no concern that *723 publicity about the confession impacting the fairness of the trial.
At the conclusion of the hearing, the State argued that the test to determine whether a defendant can receive a fair trial in the jurisdiction where he was charged is whether the potential jurors have a fixed opinion as to guilt. The court reserved ruling on the motion pending voir dire examination of the venire. The parties and the court agreed that each panel of veniremembers would be asked a general question about whether the members had heard or read anything about the case, and that further questions would be conducted with the individual veniremembers who said that they had heard or read something. Defense counsel twice stated that he agreed to that format.
The trial court denied the motion for a change of venue after the parties conducted thorough and lengthy voir dire examination of the prospective jurors.
Although Creque's motion for a change of venue was couched in terms of a claim that the pretrial publicity was so inflammatory as to be presumptively prejudicial, the evidence he presented at the hearing and the arguments he made to the court were directed toward establishing a claim that he suffered actual prejudice as a result of the pretrial publicity. He presented testimony regarding the results from a survey of 300 people who were eligible for jury service and particularly focused on their exposure to information about the crime-with a significant focus on whether they knew that Creque had confessed-and any beliefs they had as to Creque's guilt. Significantly, he agreed with the trial court's plan to reserve ruling on his motion until after voir dire examination had been completed.
We have reviewed Creque's motion and the exhibits attached thereto, the transcript of the hearing on the motion, and the transcript of voir dire proceedings. We find no abuse of discretion in the trial court's ruling. Creque had the burden to prove that one or more jurors indicated before trial that they believed Creque was guilty and that they could not set aside that bias and decide the case based only on the evidence presented at trial. Creque did not carry his burden. Many of the veniremembers had heard or read media reports about the crime, and some veniremembers had spoken with others about the crime, but none indicated that they believed Creque was guilty. All veniremembers testified that they had not formed an opinion as to his guilt. Furthermore, the trial court was in a better position than is this Court to assess a veniremember's demeanor and the truthfulness of the answers to the questions posed. We find no basis on which to set aside the trial court's finding that Creque failed to prove that he suffered actual prejudice from the pretrial publicity.
To the extent Creque's argument is that he established presumptive prejudice because the pretrial publicity saturated the community with prejudicial and inflammatory reports and that the trial court erred when it failed to consider whether he had established presumptive prejudice, we disagree. The totality of Creque's argument for a change of venue cannot fairly be construed as one relying on an allegation of presumptive prejudice; therefore, his claim that the trial court erred in failing to judge the motion based on that standard was not preserved for review. Having analyzed the issue under the plain-error standard of review, we find no plain error.
Determination of presumptive prejudice requires consideration of the totality of the circumstances, including the content and extent of the media coverage, the timing of *724 that coverage, and the characteristics of the community where the crime occurred. According to the 2010 United States Census, Morgan County is one of the largest counties in Alabama, and has a diverse population,[13] thus failing to suggest that a jury of impartial residents could not be impaneled. Our review of the media reports Creque submitted in support of his motion for a change of venue reveals that they contained largely factual reports about the crime, the investigation, and court proceedings leading up to the trial. Furthermore, the publicity immediately after the crimes covered more extensively the details of the crimes, and the subsequent reports addressed the crimes more generally and were focused to a greater extent on the court proceedings. The reports were not inherently prejudicial, inflammatory, or sensational. Although many of the reports included information indicating that Creque had confessed to the crimes, the trial court and Creque's witness, Dr. Kennedy, correctly recognized that any potential prejudice from those reports was at least minimized by the admission into evidence of the confession at trial. See Luong v. State, 199 So.3d 139, 148 (Ala. 2014) ("[I]n light of the admission into evidence at trial of Luong's confession in which he admitted that he threw his children off the bridge, the publicity about his confession and guilty-plea proceeding did not result in a preconceived prejudice that permeated the trial, preventing the seating of a fair and impartial jury."). Furthermore, many of the other details of the crimes reported by the media were admitted into evidence during the State's presentation of its case. Finally, many of the media exhibits Creque presented at the hearing-primarily the reports immediately after the crimes were committed-included numerous unsolicited, anonymous posts from Internet sites. Many of the comments were inflammatory and malicious, but nothing in the record indicates that the online comments constituted proof of county-wide deep and bitter prejudice resulting from media coverage. Rather, it is clear from exhibits that the posts represented personal opinions and not news coverage; that there is no evidence indicating that the posts were submitted by Morgan County residents who were eligible for jury duty in Creque's case; and that the posts failed to provide even an inference that they reflected the fixed opinions of anyone who might have been in the pool of the potential jurors in Morgan County. A finding of presumptive prejudice is made only in extreme situations in which a defendant proves that he or she cannot receive a fair trial because the community was saturated with inflammatory, sensational, prejudicial pretrial publicity that created a deep and bitter prejudice in the community. Creque did not make a showing that his case is in that rare category, and he is not entitled to relief based on the denial of his motion for a change of venue.
X.
Creque argues that the trial court erred when it admitted into evidence what he says was hearsay testimony suggesting that his nontestifying codefendants had cooperated with the police and that they had borne less responsibility for the crimes. Specifically, he argues that error occurred when officers testified that Gholston had told Archer where the murder weapon might be and that Eldred had told Archer where the bank bags were located and that she knew the possible location of the weapon. He also argues that Holmes *725 had testified that, when Creque said they needed to go to Krystal, Gholston had asked him why they needed to go. These statements, Creque argues, were offered for the truth of the matter asserted, that is, that Gholston and Eldred had cooperated with the police and that they had lesser roles in the offense than Creque did. Creque did not object at trial to any of the testimony. Therefore, we review the issue for plain error only, and we find none.
Creque contends that the evidence should have been excluded because, he says, it was hearsay and violated his right to confront witnesses against him. Rule 802, Ala. R. Evid., states, "Hearsay is not admissible except as provided by [the Alabama Rules of Evidence], or by other rules adopted by the Supreme Court of Alabama or by statute." Rule 801, Ala. R. Evid., provides that hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The Sixth Amendment's Confrontation Clause provides an accused in a criminal prosecution has the right to be confronted by the witnesses against him. Crawford v. Washington, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Statements of a nontestifying codefendant that were taken by police officers and offered at trial for the truth of the matter asserted fall into that class. Id. at 53, 124 S.Ct. 1354. The Crawford Court also stated that Sixth Amendment's Confrontation Clause does not prohibit the admission of testimonial statements for purposes other than establishing the truth of the matter asserted. Id. at 59 n.9, 124 S.Ct. 1354.
In Smith v. State, 246 So.3d 1086 (Ala. Crim. App. 2017), we addressed this same issue and found no plain error. At Smith's trial, investigators testified about statements given by nontestifying codefendants that implicated Smith. For example, the prosecutor asked Investigator Martin whether, early on in the investigation, one of the codefendants named anyone other than himself who might have been involved in the crime, and Martin testified that the codefendant had given several names, one of which was Smith's. Martin testified that a second codefendant was asked the same question and that codefendant named Smith, too. This Court found no plain error and stated, in relevant part, that "the investigators used vague references" to the codefendants' statements and that Martin's testimony "was not hearsay because it was not offered to prove the truth of the matter asserted," but was offered to explain the course of the investigation. Id. at 1110.
The same reasons apply to the circumstances presented here. The references to the information received from nontestifying codefendants were not hearsay because they were not offered to prove that Creque had the intent to kill either victim or was more culpable than his codefendants, as he now alleges. Rather, the information was offered in very vague terms to explain the course of the investigation and to establish reasons for the officers' actions, the development of the investigation, and its focus on Creque as one of the participants. Creque is due no relief on this claim.
XI.
Creque argues that, in his closing argument at the sentence hearing before the jury, the prosecutor argued facts not in evidence. Specifically, he argues that the prosecutor acted improperly when he urged the jury to recommend that Creque be sentenced to death because the case had more aggravating circumstances than many other capital cases. We disagree *726 with Creque's characterization of the prosecutor's argument.
A prosecutor's improper conduct during closing argument rarely results in plain error. E.g., Russell v. State, 261 So.3d 397 (Ala. Crim. App. 2015), vacated on other grounds, 580 U.S. ----, 137 S.Ct. 158, 196 L.Ed.2d 6 (2016).
" 'During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Crim. App. 1987), rev'd on other grounds, 523 So.2d 1118 (Ala. 1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). 'In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Crim. App. 1987), aff'd, 534 So.2d 371 (Ala. 1988) (citations omitted) (quoting Barnett v. State, 52 Ala. App. 260, 264, 291 So.2d 353, 357 (1974) ), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala. Crim. App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala. Crim. App. 1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala. Crim. App. 1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala. Crim. App. 1992). See also Largin v. State, 233 So.3d 374 (Ala. Crim. App. 2015), and cases cited therein.
" 'Prosecutorial statements which are merely trivial and nonprejudicial are not grounds for error.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala. Crim. App. 1985)." Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim. App. 1990), aff'd, 577 So.2d 531 (Ala. 1991).
At the beginning of the prosecutor's closing argument, after he told the jurors that they were to consider aggravating and mitigating circumstances and to determine whether Creque should be sentenced to death or to life imprisonment without the possibility of parole, the prosecutor told the jurors that the decision
"should be based on the evidence and the law that the judge is going to give to you. And in doing that look at the things that have been presented in this case and balance those out and weigh them to make your determination of what your verdict should be.
"As we said in this case, there have been three aggravating circumstances that have already been proven, a lot more than there are in a lot of capital cases already. And those have been found by your three verdicts of guilty: the one where there have been two murders during one scheme or conduct and two where there have been murders during the course of a robbery. You have found three of those already."
(R. 2893-94)(emphasis added).
Creque objects to the underlined portion of the prosecutor's statement, but he did not object to the comment at trial, so we review for plain error. We find no plain error. We find that the prosecutor's comment was simply made as part of his explanation to the jury of the process it *727 would follow in reaching its sentencing recommendation. The prosecutor correctly stated that, because the jury had found Creque guilty of the three counts of capital murder, it had necessarily found the existence of three aggravating circumstances. Evaluating the prosecutor's argument in the context of the entire trial-as we must-we conclude that the phrase to which Creque now objects was trivial and that it had no natural tendency to influence the jury's verdict or prejudice Creque. Reversal is not warranted because no substantial prejudice resulted from the prosecutor's brief trivial comment.
Creque is not entitled to relief on this claim of error.
XII.
Creque next argues that the application of the aggravating circumstance delineated in § 13A-5-49(8), Ala. Code 1975-that the crime was especially heinous, atrocious, or cruel when compared to other capital murders-to his case violated his constitutional rights. He argues that the aggravating circumstance is unconstitutionally vague in that it fails to sufficiently limit a jury's application of the aggravating circumstance and that the trial court should not have given a jury instruction on that aggravating circumstance. He further argues that, even though the trial court found that the aggravating circumstance did not exist, this Court could not say with certainty that the trial court's errors did not affect the jury's 11-1 recommendation for the death sentence. Creque did not raise any of these objections at trial, so we review them for plain error.
"A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case." Pressley v. State, 770 So.2d 115, 139 (Ala. Crim. App. 1999), aff'd, 770 So.2d 143 (Ala. 2000). A "jury charge must be construed as a whole and the language must be construed reasonably." Ingram v. State, 779 So.2d 1225, 1258 (Ala. Crim. App. 1999), aff'd, 779 So.2d 1283 (Ala. 2000)." "In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir. 1993), cited Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that 'an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.' " Williams v. State, 710 So.2d 1276, 1306 (Ala. Crim. App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997). We find no plain error as to this issue.
The trial court instructed the jury that one of the State's proposed aggravating circumstances was that the offense was especially heinous, atrocious, or cruel compared to other capital offenses. The court instructed the jury, in relevant part:
"The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked or violent. The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"For a capital offense to be especially heinous or atrocious, any brutality that is involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be a pitiless crime that is unnecessarily tortuous to the victim, either physically or psychologically.
"All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, or cruelty exceeds that which *728 will always exist when the capital offense is committed."
(R. 2925-27.)
This Court has repeatedly rejected the first argument Creque makes here-that § 13A-5-49(8), Ala. Code 1975, is unconstitutionally vague. See, e.g., Floyd v. State, [Ms. CR-13-0623, July 7, 2017] --- So.3d ----, ---- (Ala. Crim. App. 2017), and cases cited therein; Shanklin v. State, 187 So.3d 734, 806-07 (Ala. Crim. App. 2014), and cases cited therein. Therefore, Creque is not entitled to relief on that portion of his claim.
As to Creque's second argument-that the court erred when it instructed the jury on the aggravating circumstance-again we find no plain error. The trial court determined that the evidence presented was sufficient to allow submission of the § 13A-5-49(8), Ala. Code 1975, aggravating circumstance to be submitted to the jury. The trial court's determination that the instruction should be given to the jury was based, in part, on evidence suggesting that the victims were killed to avoid later identification of the perpetrators after being shot and rendered helpless and on evidence suggesting that the victims were in intense fear of their impending deaths for a period of time before they were shot. These factors are among the type of factors discussed by Alabama appellate courts when considering whether the aggravating circumstance applied. E.g., Townes v. State, 253 So.3d 447 (Ala. Crim. App. 2015) ; Luong v. State, 199 So.3d 173 (Ala. Crim. App. 2015) ; Norris v. State, 793 So.2d 847 (Ala. Crim. App. 1999). Therefore, the trial court did not commit plain error when it instructed the jury on this aggravating circumstance. Furthermore, the trial court made a specific finding in its sentencing order that the § 13A-5-49(8) aggravating circumstance did not exist. Even though the trial court correctly concluded that the State presented sufficient evidence to warrant an instruction to the jury on the aggravating circumstance, it nonetheless determined that the circumstance did not apply.
For all the foregoing reasons, we find that the trial court committed no plain error here, and that Creque is not entitled to relief on this claim.
XIII.
Creque argued in his initial brief to this Court that his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 8, 153 L.Ed.2d 556 (2002). He did not raise this issue in the trial court. In a supplemental brief, he argues that, for several reasons, his death sentence is also unconstitutional under Hurst v. Florida, 577 U.S. ----, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). Creque's arguments have been rejected in this Court and in the Alabama Supreme Court.
"In 2000, in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that the United States Constitution requires that any fact that increases the penalty for a crime above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court, applying its decision in Apprendi to a capital-murder case, stated that a defendant has a Sixth Amendment right to a 'jury determination of any fact on which the legislature conditions an increase in their maximum punishment.' 536 U.S. at 589, 122 S.Ct. 2428. Specifically, the Court held that the right to a jury trial guaranteed by the Sixth Amendment required that a jury 'find an aggravating circumstance *729 necessary for imposition of the death penalty.' Ring, 536 U.S. at 585, 122 S.Ct. 2428. Thus, Ring held that, in a capital case, the Sixth Amendment right to a jury trial requires that the jury unanimously find beyond a reasonable doubt the existence of at least one aggravating circumstance that would make the defendant eligible for a death sentence."
Ex parte Bohannon, 222 So.3d 525, 528 (Ala. 2016).
Section 13A-5-45(e), Ala. Code 1975, provides that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." See also § 13A-5-50, Ala. Code 1975, stating: "The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." The jury found Creque guilty of two counts of murder during a robbery in the first degree, a violation of § 13A-5-40(a)(2), Ala. Code 1975, and those verdicts automatically established, beyond a reasonable doubt, the § 13A-5-49(4), Ala. Code 1975, aggravating circumstance-that the capital offense was committed during the commission of a robbery. The jury found Creque guilty of murder of two or more persons pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), and that verdict established, beyond a reasonable doubt, the § 15A-5-49(9) aggravating circumstance-that he intentionally caused the death of two or more persons pursuant to one scheme or course of conduct. Therefore, the requirements of Apprendi and Ring were satisfied.
In Hurst v. Florida, 577 U.S. ----, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), the United States Supreme Court held that Florida's capital-sentencing scheme violated Ring and was unconstitutional because it did not require the jury to make any findings regarding the aggravating circumstances. The existence of an aggravating circumstance under Florida law was a determination for the judge, alone, to make. Creque argues that Hurst requires a jury to determine both the existence of an aggravating circumstance that makes a defendant eligible to receive a death sentence, and that any aggravating circumstances it finds to exist outweigh any mitigating circumstances it finds to exist. The Alabama Supreme Court rejected these arguments in Ex parte Bohannon. The Court held:
" Hurst applies Ring and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. Ring and Hurst require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty-the plain language in those cases requires nothing more and nothing less. Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment.
"Moreover, Hurst does not address the process of weighing the aggravating and mitigating circumstances or suggest that the jury must conduct the weighing process to satisfy the Sixth Amendment. This Court rejected that argument in Ex parte Waldrop, [859 So.2d 1181 (Ala. 2002),] holding that the Sixth Amendment 'do[es] not require that a jury *730 weigh the aggravating circumstances and the mitigating circumstances' because, rather than being 'a factual determination,' the weighing process is 'a moral or legal judgment that takes into account a theoretically limitless set of facts.' 859 So.2d at 1190, 1189. Hurst focuses on the jury's factual finding of the existence of a aggravating circumstance to make a defendant death-eligible; it does not mention the jury's weighing of the aggravating and mitigating circumstances. The United States Supreme Court's holding in Hurst was based on an application, not an expansion, of Apprendi and Ring; consequently, no reason exists to disturb our decision in Ex parte Waldrop with regard to the weighing process. Furthermore, nothing in our review of Apprendi, Ring, and Hurst leads us to conclude that in Hurst the United States Supreme Court held that the Sixth Amendment requires that a jury impose a capital sentence. Apprendi expressly stated that trial courts may 'exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment within the range prescribed by statute.' 530 U.S. at 481, 120 S.Ct. 2348. Hurst does not disturb this holding."
Ex parte Bohannon, 222 So.3d at 531-33.
As discussed above, the jury's three guilty verdicts established that the jury found beyond a reasonable doubt the existence of two aggravating circumstances-that the murder was committed during a robbery of Graff and during a robbery of Aguilar, § 13A-5-49(4), Ala. Code 1975; and that Creque intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct, § 13A-5-49(9), Ala. Code 1975. Thus, the jury's unanimous verdicts rendered Creque eligible for the death penalty.
Creque also argues that his sentence must be reversed because, he says, various other provisions of Alabama's capital-sentencing scheme violate Hurst and constitutional principles. He argues that each of the following provisions of the Alabama sentencing scheme violates constitutional principles: The ultimate decision to impose the death sentence is made by the trial court; the trial court is permitted to consider evidence in addition to that presented to the jury; the jury makes only a recommendation that may be overridden by the trial court, and the jury is informed that its verdict is advisory and that the trial court will impose the sentence; a jury is permitted to recommend a death sentence based on a nonunanimous verdict; and the jury is permitted to consider evidence from the guilt phase as proof of a corresponding aggravating circumstance. Each of Creque's arguments was addressed and rejected in Bohannon; therefore, Creque is not entitled to relief on any of these claims.
The Bohannon Court held: "Our reading of Apprendi, Ring, and Hurst leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment." 222 So.3d at 532. Following that precedent, we hold that Creque is due no relief on claims that his death sentence must be reversed based on the holdings in Ring, Apprendi, and Hurst.
XIV.
As required by § 13A-5-53, Ala. Code 1975, we must consider the propriety of Creque's capital-murder conviction and the sentence of death. This statutory review includes our determination of whether any error adversely affecting Creque's rights occurred during the sentencing proceedings; whether the trial court's findings regarding the aggravating circumstances and the mitigating circumstances were *731 supported by the evidence; and whether death is the appropriate sentence.
Section 13A-5-53(b) requires that this Court determine: Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; whether an independent weighing by this Court of the aggravating circumstances and the mitigating circumstances indicates that death is the proper sentence; and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Creque was convicted pursuant to § 13A-5-40(a)(2), Ala. Code 1975, for the intentional murders of Jeff Graff and Jose Aguilar during the course of a robbery. He was also convicted pursuant to § 13A-5-40(a)(10), Ala. Code 1975, for the murders of Graff and Aguilar during one act or pursuant to one scheme or course of conduct. The record shows that Creque's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala. Code 1975.
By virtue of Section 13A-5-45(e), Ala. Code 1975, which provides that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing," the jury unanimously and beyond a reasonable doubt found the § 13A-5-49(4), Ala. Code 1975, aggravating circumstance-that the capital offense was committed during the commission of a robbery. The jury found Creque guilty of murder of two or more persons pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), and that verdict established, beyond a reasonable doubt, the § 13A-5-49(9) aggravating circumstance that Creque intentionally caused the death of two or more persons pursuant to one scheme or course of conduct. The trial court found the same aggravating circumstances to exist. The trial court found one statutory mitigating circumstance-that Creque had no significant history of prior criminal activity, § 13A-5-51(1), Ala. Code 1975. The trial court considered the evidence Creque submitted as nonstatutory mitigating circumstances pursuant to § 13A-5-52, Ala. Code 1975, and found several circumstances to exist. Those circumstances primarily related to Creque's learning disability, his drug abuse, and his chaotic and dysfunctional family life. The trial court's findings as to the aggravating circumstances and the mitigating circumstances are supported by the evidence.
In accordance with § 13A-5-53(b)(2), this Court has independently weighed the aggravating and the mitigating circumstances, and we are convinced that the death penalty is the appropriate sentence in this case.
In accordance with § 13A-5-53(b)(3), Ala. Code 1975, this Court must determine whether Creque's sentence is disproportionate or excessive when compared to penalties imposed in similar cases, considering the crime and the defendant, and we find that Creque's sentence is neither. See, e.g., Luong v. State, 199 So.3d 173 (Ala. Crim. App. 2015) (murder of two or more people pursuant to one act or pursuant to one scheme or course of conduct); Spencer v. State, 58 So.3d 215 (Ala. Crim. App. 2008) (same); Shanklin v. State, 187 So.3d 734 (Ala. Crim. App. 2014) (murder during the course of a robbery); McWhorter v. State, 781 So.2d 257, 330 (Ala. Crim. App. 1999) ("two-thirds of the death sentences imposed in Alabama involve cases of robbery/murder"), aff'd, 781 So.2d 330 (Ala. 2000).
Last, as required by Rule 45A, Ala. R. App. P., we have searched the record for *732 any error that might have adversely affected Creque's substantial rights and we have found none.
For the foregoing reasons, we affirm Creque's capital-murder convictions and sentences of death.
AFFIRMED.
Windom, P.J., and Burke and Joiner, JJ., concur. Kellum, J., concurs in part and concurs in the result, with opinion.
KELLUM, Judge, concurring in part and concurring in the result.
I concur in all parts of the main opinion except Part IV. As to Part IV, I concur only in the result.

The appellant's first name is spelled in the record as both "Jordaa n" and "Jordan," and his middle name is spelled both "Stanle y" and "Stanly." A certified copy of Creque's birth certificate is a part of the record, and it lists his full name as "Jordaan Stanly Creque." (C. 1814.) We use that spelling of Creque's name throughout this opinion.

Archer was a sergeant in the Decatur Police Department in August 2011 when the crimes occurred; he was promoted to lieutenant later that year.

We note, too, that the videotape shows Archer reviewing the written statement Creque had acknowledged was true and correct and that he had signed at the hospital and that the written statement was a memorialization of the oral statement Creque had given to Archer at the hospital. With the exception of some corrections and additions Creque made during that review, Creque was not making a new statement.

Creque testified at trial that during the week, he usually slept for an hour or an hour-and-a-half each night, "if that." (R. 2266-67.) He said that there were "a lot of days" that he got no sleep at all. (R. 2331.)

Creque moved for a mistrial on the ground that, based on R.R.'s testimony, it appeared that "the jury felt like they didn't get all the evidence" and, if that was the case, it was unclear how the jurors could have arrived at a decision. (R. 2762.)

Our discussion of Creque's allegation of error as to that conversation is addressed in the next section of this opinion.

Creque first raised the argument about R.R.'s alleged "connection" to the prosecutor's office and the possibility that R.R.'s nephew had been murdered in his motion for a new trial, so his objection was untimely.

R.R. stated during voir dire that her nephew had been shot and the prosecutor's office had "defended" him. (R. 492.) She later said that her nephew "that [she had] mentioned was shot at gunpoint." (R. 524.) Her reference in this inquiry to her nephew as a defendant suggests that she was unfamiliar with legal terminology.

The trial court did not limit its articulation of race-neutral reasons to jurors struck by the State. Creque gave as his reason for striking juror no. 23, a black veniremember, that many local law-enforcement officers were his friends. The trial court offered an additional reason-that the juror's brother was on the police force. Creque said that the juror's brother or cousin was on the police force. The court then stated:
"With regard to juror number 23, if I would have been defense counsel I would have struck him. If I had been State's counsel I would have struck him. So there are reasons on both sides to strike him. I'm good."
(R. 1025.)

"[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-but leaves some doubt with respect to an element that would justify conviction of a capital offense-the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." Beck v. State, 447 U.S. 625, 638, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

The trial court and the parties agreed during the charge conference that the jury should be charged on felony-murder as a lesser-included offense to robbery-murder in Count II and Count III, and the trial court charged the jury on felony-murder as a lesser-included offense as to both counts.

We note that Creque failed to provide a citation to the record where the trial court ruled on the admissibility of the evidence, thus failing to satisfy Rule 28(a)(10), Ala. R. App. P., which requires citation to "parts of the record relied on."

On the date this opinion was released, this information could be found at https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml. A copy of the information can be found in this Court's file on this appeal.